Mark A. Strauss (*pro hac vice* forthcoming)
Ira M. Press (*pro hac vice* forthcoming)
Karen M. Lerner
KIRBY McINERNEY LLP
825 Third Avenue, 16th Floor
New York, N.Y.  10022
Tel: (212) 371-6600
Fax: (212) 751-2540
mstrauss@kmllp.com
ipress@kmllp.com
klerner@kmllp.com

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MAVERICK NEUTRAL LEVERED FUND, LTD., MAVERICK FUND, L.D.C., MAVERICK FUND II, LTD., MAVERICK LONG ENHANCED FUND, LTD., MAVERICK LONG FUND, LTD., MAVERICK SELECT FUND, LTD., and MAVERICK FUND USA, LTD., | Civil Case No. _____ |
| Plaintiffs, | |
| v. | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| VALEANT PHARMACEUTICALS INTERNATIONAL, INC., J. MICHAEL PEARSON, HOWARD B. SCHILLER, ROBERT L. ROSIELLO, DEBORAH JORN, ARI S. KELLEN, and TANYA CARRO, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

**TABLE OF CONTENTS**

I.    NATURE OF THE ACTION ..................................................................................1

II.   JURISDICTION AND VENUE ...........................................................................7

III.  PARTIES .............................................................................................................7

      A.    Plaintiffs..................................................................................................7

      B.    Defendants ..............................................................................................8

      C.    Relevant Non-Parties ............................................................................10

IV.   FACTUAL BACKGROUND .............................................................................10

      A.    Valeant's Acquisition-Centric Business Model....................................11

      B.    Valeant's Price Hikes and the Misrepresentations................................15

      C.    Valeant's Use of a Secret Pharmacy Network ......................................18

            1.    Philidor .......................................................................................18

            2.    Valeant's Other Secret Pharmacies ............................................21

            3.    Valeant Used Its Network of Secret Pharmacies to Increase Prices    24

      D.    Valeant Exploits "Patient Assistance Programs" To Raise Prices........34

      E.    The R&O Lawsuit and the Initial Disclosure of Valeant and Philidor's
            Fraudulent Arrangement .......................................................................37

V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE
      RELEVANT PERIOD........................................................................................42

      A.    Misrepresentations Regarding Valeant's Business Model ....................44

      B.    Misrepresentations Concerning Philidor................................................49

      C.    Misrepresentations Regarding Revenue Recognition and GAAP Violations........55

            1.    Material Misrepresentations Regarding Revenue       55

            2.    Material Misrepresentations Regarding Compliance with GAAP    58

            3.    Materiality of Accounting Misrepresentations       62

      D.    Material Misrepresentations as to Valeant's Internal Controls.............64

i

|  | E. | Defendants' Continued Misrepresentations and Omissions as Their Scheme Unravels ...............................................................................................70 |
|  | F. | Developments after the Relevant Period................................................85 |

VI. ADDITIONAL ALLEGATIONS OF SCIENTER..........................................92

|  | A. | Valeant's Admission of Improper Conduct ...........................................93 |
|  | B. | The Management Defendants' Role in Valeant's Business Strategy ...................93 |
|  | C. | The Management Defendants' Decision to Close Philidor....................................96 |
|  | D. | Valeant's Refusal to Pursue Remedies Against Individual Wrongdoers.............100 |
|  | E. | Congressional Hearings and Federal Investigation.............................................101 |
|  | F. | Executive Departures ...............................................................................103 |
|  | G. | Pearson's Misrepresentations to Ackman ...........................................104 |
|  | H. | Executive Compensation ...........................................................................105 |
|  | I. | The Necessity of Inflating Valeant's Stock Price to Sustain Valeant's Acquisition-Centric Business Model .......................................................107 |

VII. LOSS CAUSATION..........................................................................................108

VIII. PLAINTIFFS' RELIANCE ..............................................................................109

IX. NO SAFE HARBOR .........................................................................................111

X. COUNTS..............................................................................................................112

COUNT I VIOLATIONS OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 10(b) (Against All Defendants) ....................................112

COUNT II VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT OF 1934 (Against Defendants Valeant, Pearson, Schiller, and Rosiello)......................................114

XI. PRAYER FOR RELIEF .....................................................................................115

**XII. JURY DEMAND**...........................................................................................116

1.     Plaintiffs Maverick Neutral Levered Fund, Ltd., Maverick Fund, L.D.C., Maverick Fund II, Ltd., Maverick Long Enhanced Fund, Ltd., Maverick Long Fund, Ltd., Maverick Select Fund, Ltd., and Maverick Fund USA, Ltd., (together, "Plaintiffs" or "Maverick"), by and through their undersigned counsel, bring this action under the Securities Exchange Act of 1934 ("Exchange Act") to recover losses Plaintiffs have suffered on Valeant common stock purchased by Plaintiffs between April 30, 2015, and November 5, 2015, inclusive (the "Relevant Period").

2.     Plaintiffs allege the following upon information and belief, except as to those allegations specifically concerning or involving Plaintiffs, which are alleged on personal knowledge.  Plaintiffs base their allegations upon an investigation by Plaintiffs' counsel, which included a review of:  (i) U.S. Securities and Exchange Commission ("SEC") filings by Valeant Pharmaceuticals International, Inc. ("Valeant" or the "Company"); (iiii) regulatory filings and reports; (iii) securities analysts' reports and advisories about the Company; (iv) press releases and other public statements issued by the Company; (v) media reports about the Company (including statements to the media by various individuals regarding their participation in the fraudulent scheme detailed below); (vi) pleadings in other actions against Valeant, and (vii) other publicly available information concerning Valeant and the other Defendants.   Plaintiffs believe that a reasonable opportunity for discovery will provide additional evidentiary support for their claims.

I.     NATURE OF THE ACTION

3.     During the Relevant Period, Valeant materially misrepresented its business model as a novel and low risk model built on cost-cutting and strategic acquisitions, while failing to disclose to the market that the business model it touted to investors was in fact a sham – with artificial and unsustainable growth propped up by deceptive and illegal conduct.  For years, Valeant and its senior management – in particular, then CEO J. Michael Pearson – presented Valeant as a company with a "low-risk" business model for the pharmaceutical industry.  Valeant

1

and its senior management emphasized to investors that unlike competitors in the pharmaceutical industry, Valeant was not going to "waste" 15-20 percent of revenue on research and development ("R&D") to produce new products.  Instead, Valeant would rely on a revolutionary acquisition model whereby Valeant would acquire companies with established lines of pharmaceuticals and then implement innovative cost-cutting and marketing strategies to grow market share and resulting revenues on those acquired products.  Defendants represented that this model was lower-risk, more sustainable, and more profitable than the more R&D-focused approach used by other pharmaceutical companies.

4.     Because Valeant was not going to invest in creating its own products, the key to the long-term success of this model was Valeant's professed ability to expand the markets for its pharmaceuticals and increase the volume of sales for the products it acquired.  Valeant and its management stressed to investors that Valeant's business model was predominantly built on market expansion and volume increases.  Indeed, Valeant and its management emphasized that Valeant's financial results were achieved because volume increases were "***greater than price in terms of [Valeant's] growth***," and that Valeant's growth was fueled by its "low-risk" acquisitions model.

5.     Between 2012 and 2015, Valeant's acquisition model appeared to be working.  Valeant experienced dramatic year-on-year revenue growth – purportedly driven by organic volume growth – and Valeant's common stock price sky-rocketed by almost 350 percent.  Unfortunately for investors, this was based on deceit by the Company and its management.

6.     Hidden from investors was the fact that by 2012, Valeant and its management recognized that their model could not survive on "organic" (sustainable) market expansion and volume growth.  Unwilling to forego the artificially generated revenue on which they had come to

2

depend for their acquisition strategy and the Company's elevated stock price, Defendants resorted to price gouging to create the appearance of organic growth. This amounted to an unsustainable strategy of exponential price increases on Valeant drugs that was concealed from consumers, insurers, regulators, and investors. As but one example, in 2014, Valeant bought the rights to Nitropress and Isuprel, two drugs used to treat emergency heart conditions. Within two days of acquiring the rights to these drugs, Valeant increased their prices by **212%** and **525%**, respectively. Despite the Company's reliance on these heavy price increases, Valeant continued to represent to investors that Valeant was largely relying on organic volume growth and market expansion, and the Company and management hid Valeant's reliance on price gouging.

7.     Also hidden from investors was the fact that Valeant had developed a secret relationship with a network of "specialty pharmacies" controlled by Valeant to facilitate Valeant's practice of price gouging and artificially inflate Valeant's sales volume. At the center of this network was Philidor Inc. ("Philidor"), a pharmacy secretly created with the assistance, and for the benefit, of Valeant. Working hand-in-hand with Valeant, Philidor engaged in a fraudulent and unlawful scheme to sell Valeant's massively overpriced drugs to consumers while concealing these practices from insurance companies and the entities insurance companies work with to manage pharmaceutical costs, all for the purpose of increasing Valeant's revenues and allowing Valeant to claim falsely that its volume-based business model was working. Philidor was just one aspect of Valeant's scheme. Valeant went on to create a web of shell companies using Philidor as the hub, through which Valeant and the other Defendants acquired interests in specialty pharmacies throughout the United States for the purposes of distributing Valeant's overpriced drugs.

8.     Philidor and Valeant engaged in a multitude of unlawful and deceptive practices to facilitate Valeant's massive price hikes on its branded drugs and to inflate artificially the volume

3

of Valeant's sales by blocking the substitution of cheaper and medically equivalent generic substitutes. These unlawful "backdoor" practices, which were documented in employee manuals and confirmed by former employees, included:

- filling prescriptions through Valeant's secret network of pharmacies while concealing that the pharmacies were affiliated with Valeant;

- physically altering, modifying, and falsifying doctors' prescriptions to require that Valeant's specific branded drugs were used as opposed to low-cost generic equivalents;

- automatically refilling patients' prescriptions without the patients' or doctors' request and for no medically justified reason;

- falsifying the identity of the dispensing pharmacies to circumvent denials of claims for Valeant's branded drugs;

- waiving patient co-pays for Valeant's branded drugs to mute patients' incentive to seek cheaper generic substitutes;

- misrepresenting "actual charges" for Valeant drugs to private insurers by including waived co-pays as if they had actually been charged (because Valeant did not want the private insurers to require the copays to be charged);

- using shell companies to circumvent licensing requirements to gain access to insurance markets in various states throughout the United States.

9.      These practices were designed to circumvent the applicable legal and contractual restrictions that would have otherwise required substitution of cheaper and medically equivalent alternative drugs, whether generics or cheaper branded equivalents, for Valeant's overpriced and medically undifferentiated branded drugs. These deceptive practices risked, and ultimately incurred, significant backlash from regulators and other industry stakeholders, including the insurers and other end-payors crucial to Valeant's revenue. Valeant failed to disclose these practices and its relationship with and control over Philidor and other captive pharmacies to the pharmaceutical market or the investing public. In addition, Valeant falsified its financial statements in violation of GAAP to conceal these practices and relationships and to materially

4

overstate and mischaracterize the sources of its revenues.

10.    It was not until late September 2015 that Valeant's fraudulent practices started to come to light and facts began to emerge indicating that Valeant and its management had made numerous materially false and misleading statements to investors and other third parties.  The ramifications of this fraud have been devastating for Valeant's business and shareholder value.

11.    As the reality of Valeant's undisclosed and wrongful conduct began to emerge, Valeant and its management continued to mislead investors by minimizing and obfuscating the truth.  For example, in late September 2015 when Congress and market analysts began to uncover the astronomical prices Valeant was charging for certain drugs, Valeant and its management continued to conceal the extent of Valeant's reliance on price increases by telling investors that "Valeant is well-positioned for strong organic growth, *even assuming little to no price increases*. As we have stated many times, *Valeant's core operating principles include a focus on volume growth*…."

12.    Similarly, when Philidor's existence came to light in late October 2015, Defendants sought to persuade investors that Philidor and its business were not critical to Valeant, Valeant had always accounted for Philidor appropriately in accordance with GAAP, and that Defendants "continue[d] to be *very comfortable* with [Valeant's] 2016 EBITDA expectation of greater than 7.5 billion," even without the improper advantages that Philidor had afforded to Valeant.  Further obfuscating the impact that the dismantling of its specialty pharmacy scheme would have, Valeant announced a deal with Walgreens in December 2015 which Pearson falsely claimed would "more than replace[] Philidor," despite Valeant's internal understanding that the success of the Walgreens deal would depend upon the very same volume increases that Valeant already knew it could not achieve and had sought secretly to replace with its price-gouging model.

This was all in an effort to further mislead investors about the depths of the problems at Valeant and the unsustainability of its business model.

13.     It was not until the fourth quarter of 2015 and the first half of 2016 that the full extent of Valeant's wrongdoing was revealed.  By that point, the true financial impact of Valeant's reliance on undisclosed price increases rather than promised volume increases became known: Valeant significantly decreased its earnings forecasts on three separate occasions and reported disappointing quarterly earnings in June 2016.

14.     Since then, Valeant has forced out much of its senior management and directors and has acknowledged its own wrongdoing and the wrongdoing of other Defendants.    For example, based on an internal investigation, Valeant has conceded that its internal controls were inadequate and that its senior management engaged in "improper conduct" and set an unethical "tone at the top" that placed short-term financial results above all else.  Also, in March 2016, Valeant admitted that, contrary to Defendants' prior representations, Valeant had not accounted for Philidor properly, which required Valeant to withdraw its financial statements and acknowledge them to be false, admit that its revenue had been materially overstated for various periods, restate its revenue for fiscal year 2014, and reduce its revenue and profitability guidance for 2015 and 2016.  Any one of these admissions alone would be devastating to a company; the combination of these admissions by Valeant speaks volumes about the extent of wrongdoing by the Company and its management.

15.     Defendants' fraudulent scheme and the numerous materially misleading and untrue statements that Defendants made in SEC filings and in public statements have damaged Plaintiffs and other investors.  As the market learned about the truth through a series of partial disclosures beginning in September 2015, Valeant's stock price plummeted from an artificially inflated high

of over $262 per share on August 5, 2015, to less than $25 in June 2016. Defendants' fraud was so persuasive and the resulting losses so severe that industry participants have understandably referred to Valeant as the "Pharmaceutical Enron."  This lawsuit seeks to hold Defendants liable for the harm they have caused to Plaintiffs in connection with this massive fraud.  On May 8, 2018, Valeant announced that it was changing its name to Bausch Health Companies as it sought to revamp its image and distance itself from the scandal.

## II.    JURISDICTION AND VENUE

16.    This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

17.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391.  The acts and conduct described in this Complaint, including the dissemination of false and misleading statements and information, occurred in substantial part in this District.

18.    In connection with these acts, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States' mails, interstate telephone communications, and the facilities of a national securities exchange and market (the New York Stock Exchange ("NYSE")).

## III.    PARTIES

### A.    Plaintiffs

19.    Plaintiffs Maverick Fund, L.D.C., Maverick Fund II, Ltd., Maverick Long Enhanced Fund, Ltd., Maverick Long Fund, Ltd., and Maverick Select Fund, Ltd., and Maverick Neutral Levered Fund, Ltd. are Cayman Island exempted companies.  They are managed and advised by Maverick Capital Ltd. ("Maverick Capital").  They purchased shares of Valeant common stock, CUSIP 91911K102, on the New York Stock Exchange or over domestic Alternative Trading Systems at artificially inflated prices during the Relevant Period and suffered

7

damages therefrom.

20.     Plaintiff Maverick Fund USA, Ltd. is a Texas Limited Partnership.  It is managed and advised by Maverick Capital.  It purchased shares of Valeant common stock, CUSIP 91911K102, on the New York Stock Exchange or over domestic Alternative Trading Systems at artificially inflated prices during the Relevant Period and suffered damages therefrom.

### B.     Defendants

21.     Defendant Valeant is a Canadian corporation with its international headquarters located at 2150 St. Elzéar Blvd. West, Laval, Quebec, Canada.  Valeant's U.S. headquarters and principal place of business is at 400 Somerset Corporate Boulevard, Bridgewater, New Jersey.

22.     Valeant is a pharmaceutical and medical device company that sells medical devices and pharmaceuticals in over 100 countries around the world.   Valeant is one of the largest pharmaceutical companies in the United States.  Shares of Valeant stock trade on the New York Stock Exchange (the "NYSE") and the Toronto Stock Exchange (the "TSX") under the ticker symbol "VRX."

23.     Defendant J. Michael Pearson ("Pearson") was Valeant's Chief Executive Officer and a director of the Company (including its predecessor entity) from 2008 until May 3, 2016. From March 2011 to January 2016, Pearson was also Valeant's Chairman of the Board of Directors.  Pearson took medical leave in January and February 2016, and in March 2016 the Company announced that Pearson was going to be replaced.

24.     Defendant Howard B. Schiller ("Schiller") was Valeant's CFO and Executive Vice President from December 2011 until his resignation from the position on June 30, 2015. Schiller also served on Valeant's Board of Directors from September 2012 until June 2016. While Pearson was on medical leave in January and February of 2016, Schiller served as the Company's interim CEO.  On March 21, 2016, Valeant announced that Schiller had engaged in "improper conduct"

concerning the Company's accounting restatement and requested Schiller's resignation as a director of the Company. Schiller refused the request. He was not selected as a candidate for re-election to the Board of Directors.

25.    Defendant Robert. L. Rosiello ("Rosiello") has served as Valeant's CFO and an Executive Vice President of the Company since July 2015. Rosiello also served as one of three members of the Company's "Office of the CEO" when Pearson was on medical leave and before Schiller was appointed interim CEO.

26.    Defendant Deborah Jorn ("Jorn") was Vice President of Global Marketing at Bausch & Lomb from June 2010 until she joined Valeant in August 2013, when Valeant acquired Bausch & Lomb. Jorn was a Valeant Executive Vice President and Company Group Chairman from August 2013 through her departure on March 2, 2016. During that period, Jorn also served as general manager of Valeant's U.S. dermatology business.

27.    Defendant Tanya Carro ("Carro") was for during the relevant period the Corporate Controller of Valeant. On March 21, 2016, Valeant announced that Carro had been placed on administrative leave for "improper conduct" that led to the "provision of incorrect information to the [ad hoc] committee and the company's auditors." Carro was replaced as Controller on March 23, 2016.

28.    Defendant Dr. Ari S. Kellen ("Kellen") has served as Valeant's Executive Vice President and Company Group Chairman since January 1, 2014. Kellen temporarily served as one of the three members of the Office of the CEO during the period in early 2016 that Pearson was on medical leave and before Schiller was appointed interim CEO. After Jorn left the Company in March 2016, Kellen became the head of Valeant's U.S. dermatology business.

29.    Pearson, Schiller, Rosiello, Jorn, Carro, and Kellen are collectively referred to as

9

the "Management Defendants."

### C.    Relevant Non-Parties

30.    Philidor, Inc. was incorporated in January 2013 with the substantial assistance of Valeant.  Philidor was a specialty pharmacy registered as a Delaware limited liability company with its headquarters at 400 Horsham Road, Suite 109, Horsham, Pennsylvania.  Philidor was the hub of Valeant's clandestine network of captive specialty pharmacies used to hawk Valeant's overpriced branded drugs and to protect those drugs from competition from low-cost generic alternatives.  Philidor's only client was Valeant, and Philidor's sole purpose was to act as a mechanism through which Valeant could sell its massively overpriced branded drugs.  In December 2014, Valeant (through a subsidiary) formalized its control over Philidor, paying Philidor $100 million for a so-called option to purchase Philidor for $0 at any point in time over the ensuing decade (the "Philidor Purchase Option").  This so-called option was simply an acquisition of Philidor by Valeant; but it was structured as an "option" to justify Defendants' failure to disclose this acquisition to investors and others.

31.    Andrew Davenport was the CEO of Philidor and worked with several Valeant employees to form Philidor in January 2013.  Davenport held an approximate 40% ownership stake in Philidor.  Following Philidor's formation, Davenport worked hand-in-hand with Valeant's employees to facilitate the fraudulent sale and reimbursement of Valeant's drugs through Philidor. Davenport profited handsomely for his leading role in the fraud.  Based on his involvement in the Philidor Purchase Option transaction, Davenport personally received $40 million.

32.    In December 2016, Davenport was arrested and charged by the U.S. Attorney's Office for the Southern District of New York with four counts of fraud and conspiracy for his involvement with Philidor.

## IV.    FACTUAL BACKGROUND

### A.    Valeant's Acquisition-Centric Business Model

33.    Throughout the Relevant Period, Defendants publicly represented Valeant's business model as one that would maximize revenue growth by acquiring drugs and drug companies, increasing sales volume, and cutting costs.   Pearson held himself out as uniquely capable of leading a company with this business model.   Under Pearson's watch, Valeant acquired over 100 companies with a total deal value of over $36 billion dollars, making Valeant one of the largest acquirers in any industry over the past decade.

34.    With each acquisition, Valeant's management represented that they could cut costs while increasing sales.  Pearson, with a background in management consulting, claimed to have identified significant inefficiencies in the pharmaceutical sector.   Most prominently, Pearson sought to nearly eliminate R&D spending at Valeant and the companies Valeant acquired.  While traditional pharmaceutical companies spend at least 15 percent of their revenue on R&D, Valeant cut R&D spending to under 3 percent of revenue, electing instead to grow by acquiring already-established products.

35.    Through Valeant's acquisition focus, the Company was able to acquire a portfolio of diverse drugs.  In September 2010, Valeant completed a $3.3 billion merger with Biovail Corporation, which resulted in a combined company (with Pearson as CEO) having access to dermatological drugs, an anti-depressant drug known as Wellbutrin, and drugs used to treat central nervous system disorders.  Valeant's revenue and stock price increased following the merger.  In 2012, Valeant paid roughly $2.6 billion for Medicis Pharmaceutical Corporation ("Medicis") and its portfolio of acne medications and other aesthetic skin care products.  Valeant expanded into developing markets in Eastern Europe, as exemplified by the acquisition of the Russian-based Natur Produkt International and its portfolio of cough and cold treatments for $180 million. Valeant also targeted markets outside the traditional pharmaceutical industry, acquiring Bausch &

Lomb, an eye-care giant known for its specialized ophthalmology and contact lens products, in 2013. In April 2015, Valeant acquired Salix Pharmaceuticals and its portfolio of drugs for the treatment of gastrointestinal disorders for $11 billion.

36.    Until the fourth quarter of 2015, Valeant's acquisition model *appeared* successful, capable of cutting costs in the pharmaceutical companies that Valeant acquired while maintaining or increasing sales volumes. Indeed, the Company reported growth quarter after quarter, attracting investors based on its strong track record that Pearson touted effectively; $3.48 billion in earnings for 2012, $5.76 billion for 2013, $8.25 billion for 2014, and $7.71 billion for the first three quarters of 2015. By July of 2015, when Valeant's common stock price reached an all-time high, the market valued Valeant as the largest pharmaceutical company headquartered in the United States, with a valuation of over $90 billion.

37.    Valeant credited its success to its business model as implemented by its CEO and other members of senior management, aggressive cost-cutting strategies, innovative marketing strategies, and a portfolio of quality products. Valeant went to great lengths to assure the market (falsely) that its success was not attributable to systemic price gouging. For example, in its Form 10-Q for the first quarter of 2015, ending March 31, 2015 (filed April 30, 2015), Valeant attributed its growth to the Company's unique "output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense." Based on statements like these, Plaintiffs and Valeant's other investors reasonably believed that the Company and its management had identified significant inefficiencies in the pharmaceutical sector and was able to deliver consistent and stable growth by cutting costs and increasing sales volumes in Valeant's ever-expanding portfolio of pharmaceutical drugs. Accordingly, Plaintiffs and other investors maintained or

increased their holdings of Valeant's common stock, as Valeant's consistent growth appeared to attest to the effectiveness of Valeant's business model and Pearson's management approach.

38.     In reality, Valeant's purported success and its supposed "innovative" approach were nothing more than a fraudulent scheme.  Throughout the Relevant Period and in direct contradiction to the numerous representations made by Valeant and its management to investors, Valeant's growth was heavily reliant upon undisclosed exponential price increases (*i.e.*, "price gouging") facilitated by a secret network of captive pharmacies and other deceptive business practices.  In short, Valeant's growth was due to and dependent upon price gouging, ***not*** Pearson's expertise at reducing costs and increasing the sales volume of acquired drugs and products.

39.     Nevertheless, during the Relevant Period, Valeant repeatedly and fraudulently denied the extent to which unsustainable price gouging was responsible for the Company's growth. For example, in late September 2015 when Congress and market analysts began to uncover the astronomical prices Valeant was charging for certain drugs, Valeant and its management continued to conceal the extent of Valeant's reliance on price increases by telling investors that "Valeant is well-positioned for strong organic growth, ***even assuming little to no price increases***.  As we have stated many times, ***Valeant's core operating principles include a focus on volume growth***…." Throughout Pearson's tenure at Valeant, the Company maintained that any price increases were consistent with industry standards and not a central aspect of Valeant's business model.  The actual role of price gouging in the Valeant business model would not be revealed to Plaintiffs and other investors until 2016.  On February 3, 2016, for example, Valeant issued a press release effectively **admitting** that the Company's representations that volume was the primary driver of Valeant's growth **were false**.

40.     Had Valeant not misrepresented the importance of price increases to the Company's

13

business model, and had Valeant truthfully disclosed that its touted plans for market expansion and volume growth were a failure, Plaintiffs and Valeant's other investors would not have paid the prices they did for the Company's stock, if they would have purchased it at all.

41.     A business model dependent on significant price increases is unsustainable. Pharmaceutical companies may not indefinitely raise prices for drugs given the significant overlap between many drugs.   Eventually, a viable substitute emerges and significantly reduces or eliminates the value that a company can generate by raising the prices of drugs in its portfolio. Accordingly, to sustain investment in Valeant, Pearson repeatedly denied the central role that price increases played in the Valeant business model, claiming that Valeant's growth was primarily driven by volume increases.

42.     In an apparent attempt to conceal the extent to which Valeant's growth was driven by unsustainable price increases, Valeant changed its disclosure practices in 2013.   Based on these changes, investors were unable to probe Valeant's repeated representations that Valeant's growth was attributable to volume increases (and not price increases).   For example, Valeant refused to provide revenue numbers for major acquisitions, so that investors were unable to determine whether the revenues Valeant enjoyed from the drugs it acquired were growing by price or volume increases.   Likewise, Valeant reduced transparency by decreasing the number of operating segments presented in disclosures from four (distinguishing between U.S. Neurology & Other, U.S. Dermatology, Canada & Australia, and Emerging Markets) to two (distinguishing only between Developed and Emerging Markets).   With financial reporting provided on only two operating segments for the rapidly expanding Company, it became impossible for investors to determine with precision the drivers of Valeant's growth.

43.     The centerpiece of Valeant's fraudulent and undisclosed price gouging model was

its secret use of captive pharmacies.  More specifically, Valeant developed a fraudulent and secret network of closely-related or jointly held pharmacies to allow the Company to increase the prices of its branded drugs exponentially, even when cheaper generic versions of the drugs or cheaper versions of near-perfect substitutes were available.  Valeant went to great lengths to conceal the existence of this scheme from investors (as part of hiding the importance of price increases to the Valeant business model), from insurers (to mask the fact that insurers were paying a premium for Valeant-branded pharmaceutical drugs when cheaper alternatives were available), and from competitors.  Indeed, Valeant structured the transaction by which it acquired Philidor as the purchase of an "option" for $100 million to potentially acquire the pharmacy for nothing within the next ten years, to avoid disclosing the transaction to investors.  The cloak of secrecy under which Valeant concealed its reliance on Philidor and other specialty pharmacies demonstrates the lengths that Valeant was willing to go to conceal its broader secret – that its ability to expand sales of its drugs on a legitimate basis rather than through price gouging was a sham.

### B. Valeant's Price Hikes and the Misrepresentations

44.     Unbeknownst to Plaintiffs and other investors, by late 2012, Valeant and its management recognized that growth through Valeant's "acquisitions" model could not be sustained by relying on cost-cutting and volume.   Thus, Valeant and its management secretly reoriented the Company's business model to engage in undisclosed price gouging.

45.     A 2016 report published by the United States Senate revealed that, in late 2012, Valeant was facing declining revenue in its Neurological and Other division.  To fight this decline, Valeant's management, including Pearson, developed, approved, and implemented a plan called the "Orphan Drug Pricing Strategy."  The Orphan Drug strategy aimed to combat declining revenue by adopting repeated price increases.  The precise price increases were determined by Pearson and other high-level Valeant executives.

15

46.    One early example of this strategy occurred after Valeant's acquisition of Cuprimine, a drug used since 1965 to treat Wilson's disease, a rare condition that prevents the body from processing copper.  As part of the Company's undisclosed "Orphan Drug Strategy," Valeant executives, including Pearson, raised the price of Cuprimine by nearly 5,800%.  Valeant similarly approved drastic price increases on Syprine, raising its price by 3,200%.

47.    After engaging in price gouging on those drugs and certain others, Valeant executed an across-the-board price-gouging strategy to identify and implement price hike opportunities.  For example, on December 3, 2014, Andrew Davis, Valeant's SVP for Business Development, emailed Laizer Kornwasser, Valeant's EVP and Company Group Chairman, and others at Valeant about purchasing the drugs Isuprel and Nitropress from Marathon.  Specifically, Davis wrote that he had identified a drug manufacturer, Marathon, whose "value is largely derived from 2 hospital products [Isuprel and Nitropress] . . . which have no IP [i.e., protection from generic competition]."  Steven Sembler, the General Manager of Neurology, responded: "In looking at the information, we would have to do this for the two products that make up [the] VAST majority of revenue . . . .  This would have to be a price play (if we determine there is upside to take price) as we don't have a sales team calling on hospitals (i.e., no direct promotion)."  In February 2015, Valeant acquired the drugs from Marathon for approximately $350 million and immediately raised the price of Isuprel by 500% and Nitropress by 200%.  It subsequently further raised the price of both drugs resulting in a total increase of 720% for Isuprel and 310% for Nitropress.

48.    The revenue from these two drugs alone accounted for over 5% of Valeant's 2015 revenues of $10.4 billion.  Further, these drugs were responsible for a significant portion of Valeant's revenue growth, and that revenue growth was substantially based on price increases.  Valeant's internal documents confirm this.  For example, on May 21, 2015, Schiller, then the CFO

of Valeant, sent an email to Pearson with the subject "price volume."  He stated:

> Last night, one of the investors asked about price vs volume for Q1.  Excluding marathon, price represented about 60% of our growth.  If you include marathon, **price represents about 80%**.

This was in stark contrast to Valeant's representations that the Company was focused on volume growth.  As an analyst with RBC Capital Markets, LLC reported on May 26, 2015, a key takeaway from meetings with Valeant management and Pearson in particular, was "volume not price is fueling organic growth."

49.     A report in late 2015 revealed that Valeant reportedly raised 54 of its brand-name drugs by an average of 66%, five times more than any other pharmaceutical company in the industry.  Notable examples, in addition to Isuprel, Nitropress, Cuprimine, and Syprine include: (a) inflating the price of Carac Cream, a treatment for precancerous lesions, by more than 1,100%, from $230 per tube to over $2,800; (b) increasing the price of Glumetza, a drug used to control blood sugar for people with type 2 diabetes, by more than 1,000%, from $900 per 90 tablets  to over $10,000; (c) gouging the price of Targetin, a treatment for skin problems associated with T-cell lymphoma, by over 1,600%, from $1,800 per tube to over $30,000; (d) raising the price of Wellbutrin XL, an anti-depressant drug, by $1,400 per one month's supply while the generic alternative sells for $30; and (e) raising the price of Addyi, a libido enhancing drug for women, by 100% immediately after Valeant acquired the drug from Sprout.

50.     In theory, inflating the prices of Valeant's products would then allow the Company to acquire additional pharmaceutical products and increase the prices of the acquired products, so long as the extent of the price-gouging remained hidden.  In reality, the short-term revenue gains undermined the long-term viability of Valeant because the extent of the price increases, especially when conducted through fraudulent means like Philidor, could not remain hidden forever.  Indeed, Valeant's price-gouging strategy created the extensive business, reputational, and regulatory risk

that ultimately brought Valeant's stock price crashing down when the ramifications of the strategy were discovered.

### C.   Valeant's Use of a Secret Pharmacy Network

51.   Because Valeant was relying on undisclosed price gouging rather than the claimed volume increases to sustain its growth, it needed to ensure it could sustain those price increases despite a competitive pharmaceutical industry.  To do so, Valeant relied upon a secret network of controlled specialty pharmacies to increase sales of its branded drugs despite the availability of cheaper alternatives.  Specifically, Valeant's secretly controlled network of pharmacies protected Valeant drugs from competition by ignoring legal and contractual mandates that require the substitution of generic equivalents for Valeant-branded drugs. Additionally, Valeant's controlled pharmacies submitted false claims information to insurers and other third-party payors.  The scheme allowed Valeant to increase the price of drugs without decreasing the volume of drugs sold no matter the price – and thereby continue to mislead investors about the sustainability of the Company's business model.   Insurers and other third- party payors therefore were deceived into paying for Valeant's exorbitantly priced branded drugs and were prevented from substituting cheaper generics when working through Valeant's captive specialty pharmacies.

#### 1.   Philidor

52.   Philidor was the most prominent of these captive pharmacies, licensed in 45 states and the District of Columbia while operating as a purportedly independent specialty mail-order pharmacy.   True specialty pharmacies primarily sell self-administered specialty drugs covered under a patient's pharmacy insurance benefit.   These specialty drugs are usually highly differentiated brand-name drugs for patients undergoing medical treatments for complex illnesses such as HIV and cancer.   These drugs often are self-administered through injections and may require constant refrigeration.   None of this was true for drugs supplied by Philidor.

53.     To the contrary, Philidor dispensed **_only_** Valeant's undifferentiated traditional brand-name drugs – primarily Valeant's dermatological products – many of which had generic low-cost substitute drugs.   And far from being independent, as Valeant attempted to persuade investors when Philidor first came to light, Philidor has since acknowledged that Valeant was Philidor's "**_only client_**."

54.     Further, from Philidor's incorporation on January 2, 2013, Valeant was closely linked to Philidor's operations and development.   Valeant's employees worked closely with Philidor's founders in establishing Philidor as a means of funneling Valeant's high-priced brand-name drugs to patients.   In December 2012, Valeant hired manager Gary Tanner to serve as the Company's special "liaison" with Philidor and to help develop the pharmacy's operations.   On January 2, 2013, the same day that Philidor was incorporated, Valeant hired Laizer Kornwasser, a former senior executive at Medco, to serve as Valeant's EVP/Company Group Chairman to oversee Valeant's relationship with Philidor.   Throughout their time at Valeant, Kornwasser and Tanner oversaw Philidor's operations and were compensated handsomely by Valeant for their work with Philidor.

55.     From Philidor's incorporation in January 2013 until October 2015 (when Valeant finally revealed its relationship with Philidor), Valeant installed a number of its employees (including Kornwasser and Tanner) at Philidor to ensure that Valeant's fraudulent business objectives would be met.   For example, Valeant placed a team of thirty employees within Philidor so that those employees could educate doctors on how to direct patients to Valeant's products. Throughout Philidor's existence, Valeant employees supervised critical aspects of Philidor's business operations, including interviewing potential new hires for Philidor and helping to manage Philidor's billing practices.

56.     Valeant went to great lengths to conceal Valeant's connection to Philidor.   For example, Valeant employees used fictitious names when sending emails from Philidor accounts to hide the fact that the employees were working for both Philidor and Valeant.

57.     Valeant's close relationship with Philidor went far beyond overlapping personnel. On December 15, 2014, Valeant paid $100 million for the option to purchase Philidor for $0 any time within the next ten years, and agreed to certain milestone payments based on Philidor's sales. The first milestone payment for $33 million was paid on January 15, 2015, and further milestone payments were contingent upon achieving certain sale thresholds.

58.     Consistent with its efforts to conceal the use of overlapping employees, Valeant improperly structured the transaction with Philidor to avoid public disclosure.   Valeant's subsidiary KGA, rather than Valeant, was used to obtain the Philidor Purchase Option.  And, rather than call the transaction what it was – a purchase – Valeant acquired Philidor through a convoluted put option structure, whereby Valeant paid $100 million to Philidor's owners, including some Valeant employees, for the option to acquire Philidor for ***nothing*** within the following ten years.

59.     The Philidor Purchase Option agreement was an acquisition in all but name.  Not only did Valeant, through KGA, pay the entirety of Philidor's valuation up front, but Valeant also had the right to form a joint steering committee that would "assess and discuss" matters relating to Philidor's "internal policies, manuals and processes."   The transaction document also gave Valeant the right to "make the final determination" with regard to "the Strategic Plan of Philidor" and "the compliance of [Philidor] with applicable Legal Requirements, Contractual obligations (including agreements with Third-party payors) and the Company's internal policies and manuals" in the event of any failure to reach an agreement among the joint steering committee members. The joint steering committee also was given the "the right to review, prior to their submission, all

applications of the Company for licenses and permits (including state pharmacy licenses)." In effect, Valeant obtained the right to control Philidor, consistent with the fact that Valeant had already been controlling critical aspects of Philidor's business since inception by placing Valeant employees in supervisory roles at Philidor.

60.     Further, Valeant and Philidor entered into an exclusive distribution and services agreement on December 15, 2014. The agreement superseded the previous services agreement that Philidor had signed in January 2013 with Medicis (one of the pharmaceutical companies that Valeant acquired in 2012). Under the services agreement, Valeant had the right to inspect Philidor's policies and procedures and conduct site visits to verify compliance with the procedures that Valeant imposed upon Philidor. This was yet another aspect of the relationship confirming that Valeant effectively controlled Philidor.

### 2.     Valeant's Other Secret Pharmacies

61.     After forming Philidor, Valeant and its management created a number of shell companies affiliated with Philidor through which Valeant surreptitiously acquired interests in smaller retail pharmacies across the country to extend the captive pharmacy network. Through this process, Valeant and its management developed a network of at least 76 captive specialty pharmacies through which Valeant could file pharmacy applications with state regulators. On these pharmacy applications, the shell companies that Valeant controlled through Philidor frequently issued false and misleading statements to hide from regulators and investors the true nature of the relationship between Valeant, Philidor, and the network of shell companies. When submitting a pharmacy application to the California State Board of Pharmacy on or about August 15, 2013, for example, Philidor misrepresented the relationship between Valeant and Philidor. The California State Board of Pharmacy ultimately found that Philidor and its CEO Davenport had falsely represented the following facts under penalty of perjury:  (i) that no entities possessed an

ownership interest in Philidor equal to or exceeding 10%, when Valeant in fact controlled Philidor; (ii) that Davenport himself did not possess an ownership stake in Philidor, when in fact he held a 27% stake in the pharmacy; (iii) that there were no persons with a "beneficial interest" in Philidor, when sixteen owners or shareholders did possess such an interest; and (iv) that Alan Gubernick was Philidor's accountant and bookkeeper, when in fact an employee of a Valeant/Philidor subsidiary (known as BQ6 Media), Gregory W. Blaszczynski, was Philidor's accountant and bookkeeper.

62.     Philidor's application was denied by the California State Board of Pharmacy on May 16, 2014, due to the numerous knowingly false statements made by Philidor and its CEO Davenport.  The California State Board of Pharmacy found that these false statements were made "with the intent to substantially benefit" Philidor and Davenport, and that Philidor and its CEO were therefore "guilty of unprofessional conduct."   The denial of Philidor's pharmacy license was affirmed by the California State Board of Pharmacy in February 2016.

63.     Eager to gain access to California's market even by improper means, Valeant and its management orchestrated a scheme to circumvent the California State Board of Pharmacy's denial of Philidor's requested license.   Specifically, Defendants caused a Philidor/Valeant-affiliated company, Lucena Holdings ("Lucena"), to purchase a stake in an existing California pharmacy called "West Wilshire Pharmacy."  On September 24, 2014, Defendants caused Lucena to file a "Change of Permit Request" with the California State Board of Pharmacy.  At the direction of Defendants, Lucena's filing falsely stated that:  (i) Lucena did not have a parent company; (ii) there was only one entity or individual with an interest in Lucena, (iii) that Lucena's CEO and pharmacist-in-charge, Sherri Leon – who had been Philidor's Director of Pharmacy Operations at the time when the California State Board of Pharmacy had denied Philidor's pharmacy license –

was not "associated in business with any person, partnership, corporation, or other entity whose pharmacy permit . . . was denied."

64.     The California scheme was not limited to Lucena.  On December 1, 2014, Philidor caused another shell company, Isolani, LLC ("Isolani"), to acquire a California-based mail-order pharmacy, R&O Pharmacy ("R&O").   Once Philidor acquired R&O through Isolani, R&O's business grew significantly by dispensing thousands of prescriptions for Valeant- manufactured drugs – primarily expensive prescriptions for acne or eczema-related dermatological conditions. Isolani concealed from California regulators its relationship with Philidor and Valeant, and R&O only uncovered the relationship between Philidor and Valeant when R&O conducted its own investigation into Philidor.

65.     Defendants and Philidor conducted a similar scheme in Texas, through a Philidor-controlled shell company called Back Rank, LLC ("Back Rank").  Back Rank, whose managing member was James R. Fleming, Philidor's Controller, took control of Houston-based Orbit Pharmacy, Inc. ("Orbit Pharmacy").   In an application filed with the Texas State Board of Pharmacy in September 2015, Orbit Pharmacy – at the direction of Defendants and Philidor – falsely represented that no state had ever denied a pharmacy application filed by any of "the pharmacy's owner[s] or partner[s]."   This was false because California had denied Philidor's pharmacy application in the prior year.

66.     While elements of Valeant's secret captive pharmacy network have become public, Valeant and Philidor still have not disclosed the full scope of the network or shell companies and affiliated subsidiaries that Valeant and Philidor used to hide the fraud.

67.     Notably, Valeant never disclosed Philidor in any of its SEC filings prior to October 19, 2015, and it structured the transaction acquiring Philidor in an improper attempt to avoid public

disclosure.   Philidor also never publicly disclosed its arrangement with Valeant prior to October 19, 2015.

### 3.    Valeant Used Its Network of Secret Pharmacies to Increase Prices

68.    Because Valeant could not support its purportedly "low-risk" model on volume growth and cost cutting, Valeant and its management sought to implement significant price increases across Valeant's portfolio of acquired drugs.    Valeant's use of its captive secret pharmacy network was vital to the Company's true (and undisclosed) business model by avoiding competition from generic substitutes, inflating prices, and increasing fraudulent sales. Valeant's pricing would have been unsustainable in a competitive market:  customers generally would not pay the exorbitant prices for Valeant's brand-name drugs, and doctors would not commonly prescribe Valeant's exorbitantly priced brand-name drugs, had the existing generic alternatives been made available by the captive specialty pharmacies.  Valeant's secret network of captive pharmacies, however, insulated Valeant's branded drugs from generic competition, as Valeant could be certain that the pharmacies would dispense Valeant's branded drugs rather than generic equivalents.

69.    Philidor's fraudulent dispensing of Valeant-branded drugs violated the laws of fourteen states – including the state in which Philidor is headquartered, Pennsylvania – that require pharmacists to substitute generic equivalents for branded drugs.  In the states where cost- cutting laws do not exist, contracts between pharmacies and insurers or their PBM agents generally mandate that the pharmacy dispense generic substitutes in place of branded equivalents whenever possible.  Philidor and Valeant's fraudulent conduct violated these statutory and contractual requirements.

70.    Through its illegal and fraudulent practice, Valeant shielded its branded products from generic competitors.  This scheme allowed Valeant to maintain or increase high prices not

only for pharmaceutical drugs no longer protected by patent and subject to competition from direct generic equivalents, but also for branded drugs still protected by patents for which a near-perfect substitute existed.

71.    Accordingly, Valeant was able to fraudulently present a compelling story of unparalleled efficiency and growth to investors like Plaintiffs.  Valeant appeared immune to the limitations on growth encountered by seemingly every other pharmaceutical company.  Other drug companies see their drug-specific revenue decline when a generic version of that drug becomes available, a generic version of a near-perfect substitute becomes available, or a cheaper branded drug reaches the market.  Valeant, however, seemed capable of maintaining growth indefinitely. This was a façade.

72.    As but one example, Valeant's fraudulent arrangement with Philidor allowed the Company to double revenue generated by Wellbutrin XL, an off-patent anti-depressant sold through Philidor and the captive pharmacy network.  Valeant was able to double the drug's revenue by almost tripling prices from less than $6,000 to $17,000 for a year's supply of the drug, despite the existence of a generic equivalent for only $360 a year.[1] These results required the undisclosed illicit scheme.

73.    The fraudulent captive pharmacy arrangement similarly enabled Valeant to increase the price of and revenue derived from its dermatology drugs even when those drugs faced competition from far cheaper generic equivalents.  From 2013 to 2015, during which time Valeant launched and exploited its secret captive pharmacy scheme and experienced significant stock price appreciation, Valeant dramatically increased the price of more than 50 drugs.  The price increases significantly outpaced those of competitors in the pharmaceutical industry. Although the Company

---

[1] Valeant refused to release drug-specific revenue numbers, which allowed the Company to conceal its price gouging.

characterized its price increases as price "optimization," in reality the Company was engaged in massive and unprecedented price gouging.  Over a nearly two-and-a-half-year period, Valeant instituted the following pricing increases, among others:    557% for Carac Cream; 381% for Wellbutrin XL 300 MG Tablet; 279% for Vanos 0.1% CRM; 250% for Targetin 60g 1% Gel; and 223% for Aldara 5% CRM.  Similarly, Valeant raised the prices for Tretinoin 0.1% CRM by 328% over one and a quarter years and for Noritate 1% Cream by 212% over one and a half years.

74.    These shocking price increases would not have been possible but for Valeant's undisclosed fraudulent arrangement with Philidor and the captive pharmacy network.   As described above, Valeant undertook herculean efforts to conceal its scheme.  Valeant prevented Philidor and the other captive pharmacies from disclosing their relationship with Valeant to the insurance companies, to regulators, to other third-party payors, or to PBMs.  Valeant and Philidor forbade former employees from mentioning Philidor's relationship with Valeant. Starting in September 2015, Philidor began requiring employees to sign confidentiality agreements that enabled Philidor to sue workers who revealed information about the Philidor and Valeant relationship.

75.    Valeant and Philidor expressly misrepresented their relationship – and the involvement of additional captive pharmacies – to insurers and other third-party payors, their PBM agents, and their members to increase the reimbursements paid by the payors and to maximize Valeant's drug sales.  Valeant's fraudulent scheme is documented in manuals provided to Philidor employees charged with handling claims submitted to third-party payors.  The manuals explained that "[w]e have a couple of different 'back door' approaches to receive payment from the insurance companies."  The "back door approaches" involved rewriting prescription information, filing claims for refills that patients never requested, and falsely representing the identity of the

pharmacies that dispensed the drugs to reduce denials of claims for Valeant drugs. Valeant's internal emails and correspondence between Valeant and Philidor, including a July 19, 2015, email from Philidor's CEO Davenport, demonstrate that both parties in the fraudulent arrangement – Valeant and Philidor – were fully aware of these "back door approaches."

76.     To rewrite prescription information, Valeant and Philidor instructed employees at Philidor and other captive pharmacies to deliberately modify the doctor's prescriptions so as to require the prescription be filled with expensive Valeant-branded drugs, rather than the cheaper generic substitutes that the pharmacies would be required to provide by law or contract. Generally, pharmacists who receive a prescription for a branded drug instead dispense a generic substitute when available. Because some alternatives may not be perfect substitutes, physicians are able to prescribe particular branded drugs by specifying "dispense as written" on the prescription. *Bloomberg* reported on October 29, 2015, that Philidor employees confirmed that Valeant's captive pharmacies **regularly falsified prescriptions** by adding the words "**dispense as written**" whenever the prescription included Valeant products and cheaper generic substitutes were available. The employees interviewed in the *Bloomberg* investigation specified that Valeant and Philidor employed this fraudulent method for increasing sales volume at the inflated prices especially for Valeant's dermatologic products for which third-party payors would otherwise refuse to fund, including Retin-A Micro and Vanos.

77.     Valeant directed two forms of fraud perpetrated by Philidor employees. *First*, Valeant directed Philidor employees to avoid third-party payors' denials of claims for expensive Valeant-branded drugs by modifying prescription codes so that the prescriptions appeared to order only Valeant-branded drugs, thereby precluding the use of low-cost generic alternatives. *Second*, when third-party payors denied initial claims for Valeant drugs because the prescription allowed

for generic substitutes, Philidor employees falsely resubmitted modified prescriptions allowing only for the dispensing of Valeant drugs as new prescriptions.

78.     Valeant   used   false   pharmacy identifications to misrepresent to insurance companies and other third-party payors which pharmacies were dispersing the Valeant-branded drugs.  Valeant and Philidor's manual for handling claims directed Philidor employees to submit claims to third-party payors or their PBM agents first using Philidor's National Provider Identification Number ("NPI").  If the claim was rejected, the manual directed employees to resubmit that claim on the NPI of another captive-Valeant/Philidor controlled pharmacy.  Valeant thus directed Philidor employees to claim that a pharmacy dispensed a prescription that the pharmacy had not actually dispensed and may not have even stocked.

79.     Former Philidor/Valeant employees told *Bloomberg* that they received maps and specific instructions detailing the false NPI information that they should fraudulently submit if a third-party payor denied a claim from a particular dispensing pharmacy.  Valeant/Philidor issued a manual instructing employees on how to handle claims which stated that if an employee received a denial for a particular third-party payor, it should "submit the NPI for our partner in California, West Wilshire Pharmacy" because "[t]here is a good chance they are contracted."  In the event that the third-party payor denied West Wilshire Pharmacy's NPI, Valeant/Philidor instructed employees to replace the denied pharmacy with "Cambria Central Fill insurance and run that as the primary."   Cambria Central Fill, based out of Philadelphia, Pennsylvania, was another of Philidor's secret retail pharmacies.

80.     Valeant and Philidor also directed pharmacies in the Valeant network, such as Isolani, to use the NPI belonging to the California-based R&O Pharmacy, which was another Valeant/Philidor controlled entity.  In many instances, Philidor employees submitted claims for

prescriptions that R&O had never filled and for drugs that R&O did not even stock.  By directing employees to submit fraudulent NPI information for claims, Valeant and Philidor sought to secure payment for properly denied claims.  In an interview with the Southern Investigative Reporting Foundation, a former Philidor claims adjudicator, Taylor Geohagen, explained this fraudulent practice as follows: "Pretty much everything we did in the [Philidor] Adjudication department was to use the [NPI] codes from the pharmacies we bought out to get something [approved] in a pinch."

81.     Additionally, Philidor and Valeant submitted falsified payer audits to third-party payors or their PBMs.  Generally, the retail pharmacies themselves submit payer audits for the prescriptions they fill.  By contrast, in Valeant's captive pharmacy network, Valeant's agents would submit the payer audits on behalf of all the captive pharmacies, so as to inaccurately state that a particular pharmacy had filled a particular prescription, when those prescriptions had actually been filled by Philidor or one of Valeant's other captive pharmacies.  To perpetrate this fraud on the third-party payors, Defendants' agents falsely claimed authority to approve the audit statements on behalf of the retail pharmacies, or even forged the signatures of management at those pharmacies.

82.     For example, a July 14, 2015, email between Russell Reitz of R&O Pharmacy and Eric Rice, Senior Director at Philidor, demonstrates that Defendants' agents' audit statements submitted on behalf of R&O Pharmacy falsely claimed that R&O had dispensed Valeant prescriptions when in fact Philidor had actually filled those prescriptions.  In that email, Reitz wrote to Rice that Philidor fraudulently billed R&O for prescriptions "filled by some other pharmacy" or "filled and billed before the execution of the R&O purchase and sale agreement," using Reitz's National Council for Prescription Drug Programs number without Reitz's knowledge or consent.  In some cases, the prescriptions that Philidor claimed R&O dispensed in R&O's

fraudulent audit statements were for drugs that R&O not only had not dispensed, but also did not stock.

83.     Valeant and Philidor also fraudulently submitted numerous prescription renewals for reimbursement when patients had not requested renewals of their prescriptions.  As Philidor customers explained in an investigative article published by *New York* magazine on January 13, 2016, Valeant and Philidor directed its captive pharmacies to automatically refill patients' prescriptions for Jublia and other Philidor-dispensed Valeant drugs regardless of whether the patients had actually requested refills.  Even when patients actively refused refills, Philidor made it nearly impossible for those patients to decline or cancel the refills.  Accordingly, Valeant and Philidor fraudulently represented to third party-payors and PBM agents that patients had requested prescription renewals for Valeant-branded drugs even when patients actively declined a prescription renewal.

84.     Valeant also sought prescription renewals for non-chronic conditions that are generally resolved by a limited course of treatment.  Thus, for certain dermatological conditions treated by Valeant-branded drugs that required only one course of treatment, Valeant fraudulently stated that patients had requested prescription renewals from third-party payors even though the conditions were resolved through a single treatment.  Because Valeant directed Philidor to waive patient copays through the deceptive PAPs program, discussed above, this scheme frequently went undetected, since there existed no incentive for patients to complain about the unnecessary refills for which the patients were not charged.

85.     One Philidor employee explained in an online forum that Philidor frequently "auto ship[ped] [Valeant-branded drugs] without proper approval" even when "most people do not need these refills" because "it is free for the patient but Philidor gets anywhere from $550-$1220 from

the insurance companies."  Another Philidor employee further explained:

> They took the list of customers who had been approved by [insurance] and had refills available.  Instead of waiting for the customer to call they would dial and leave a msg saying your refill will be shipped unless you call within 24 hrs.  They would do this on the 30th day of the rx.  Previously they had a Co pay so would have to wait to get approval to charge the 35.00 Co pay, making the Co pay 0 allowed them to ship refills whether u wanted them or not.  Not a bad money making idea except most people did not really need refills of Solodyn so soon . . .   Of course these refills were out the door ASAP sometimes within an hour of the call and the [insurance] money would come in.

> What patients don't get is your [insurance] company is paying 500 plus bucks for an old medication reformulated and refills not needed.  I would bet a lot of Solodyn and Jublia bottles are just lying around still in the shipping package.

> If you ever saw Wolves of Wallstreet well that was sorta what some of us saw at Philidor.  Let's say on average a person does not need a refill of Solodyn for 45 or 60 days from the 1st fill and you force them to take it at 30 days every month $$$$$$$$$$$$$$$ and a ton of it! Think about it.

86.    Valeant and Philidor also misrepresented to insurance companies and other third-party payors the dispensing pharmacies "actual charges" for Valeant-branded drugs by failing to disclose that Valeant instructed Philidor to waive patient copays on those drugs.  Insurance companies institute copays to (i) deter insured patients from wastefully consuming medically unnecessary pharmacy products, (ii) incentivize insured patients to choose generic substitutes when available, and (iii) discourage unnecessary refills of prescription medications.  By waiving copays at Valeant's direction, Philidor removed all three incentives for controlling unnecessary costs.  In turn, this meant that third-party payors would incur the increased costs associated with the unnecessary and exorbitantly priced Valeant-branded drugs, and those increased costs would ultimately be passed through to patients and the insured public.  To discourage pharmacies like Philidor from waiving copays, PBMs contract with pharmacies to mandate that pharmacies attempt to collect the copayment, and submit their claims reflecting "actual charges," which take into account discounts or waivers applied.  While Philidor would waive copays at Valeant's direction,

Philidor frequently submitted claims for the prescriptions that falsely represented to the insurers and other third-party payors that the patient had been charged the full price of the drug and contributed the copay.

87.      Valeant and Philidor also issued patient-facing misrepresentations to increase the volume of Valeant's drug sales.  Valeant and Philidor falsely represented to doctors and patients that Valeant drugs were available at no cost if the patients and physicians submitted their prescriptions directly to Valeant's captive secret pharmacy network.   Channeling patients and physicians through Philidor allowed Valeant to guarantee that prescriptions would be filled with Valeant-branded drugs, rather than cheaper generics as would occur by law or contract if filled by a pharmacy outside of Valeant's captive and undisclosed network.   In furtherance of this scheme, Valeant and Philidor issued coupons that fraudulently told patients that third-party payors would not be billed if the prescriptions for Valeant-branded pharmaceuticals were submitted directly to Philidor.    One patient submitted a consumer complaint to the Better Business Bureau ("BBB") on March 2, 2015, which the BBB documented as follows:

> Complaint:  Received a call from the [Philidor] representative stating that they wanted to refill a Rx for ******.  They stated that they had a coupon that would pay for the medication completely, and even said "at no cost to you". Unfortunately, I said OK.  In reviewing my healthcare plan claims, I noticed that they bill my Plan for $449.55.  Since I have a $1500 deductible, I may be liable for this charge.  This is not what I agreed to and not what the representative said would occur.   I would like this claim removed from my healthcare plan immediately.  I will return the ****** unopened in order to have this taken off my Claims.

88.      In reality, the third-party payors were billed for the Valeant-branded drugs, despite Valeant and Philidor's representations to the contrary.   Valeant and Philidor's billing of the insurers was then passed onto the patients, whom Valeant and Philidor had promised not to bill. Indeed, one patient reported:

> [M]y dermatologist provided me with a "Trial Coupon" for JUBLIA; a topical solution used to treat toenails.  The trial coupon offers a "$0 copay for 12 months"

of this medicine . . . .  Philidor RX Services continues to INCORRECTLY bill my health insurance which, in turn, is impacting my HSA / MRA Funds - each time, removing $100 from MY Medical Reimbursement Account.

89.    Another customer reported similar conduct to the BBB:

Hello.  My child had an appointment with a local dermatologist.  While we were there we were referred to Philidor RX Services for filling two acne prescriptions.  The dermatologist assured me that I would be charged only $25 and nothing more from our health insurance company.  She also gave us a coupon to use for one of the prescriptions that would make it free.  I called Philidor and gave them all of the information that was provided to me by the dermatologist.  Philidor charged me $220 from my FSA account ($110 for each prescription).  I contacted Philidor and spoke with a man who said his name was Mickey.  Mickey told me that I needed to submit a statement from my insurance company showing that $220 was withdrawn from my FSA account.   I did as requested and have sent the information via email to Philidor, Attn: Mickey, twice.   I have received no response and no refund.

90.    Anticipating these complaints, Valeant and Philidor sought to insulate their captive pharmacies from consumer retaliation.  Valeant and Philidor attempted to make it as difficult as possible for patients to complain to Philidor that their insurers had been billed for Valeant-branded drugs despite coupons or sales literature indicating that insurers would not be billed.  Philidor customers and patients frequently reported being directed to sales staff (who rebuffed the complaints) when they tried to report the fraudulent marketing schemes to Philidor.

91.    Valeant was aware of – and indeed was directing – Philidor's improper practices even before the $100 million payment to Philidor was made.  As explained above, Valeant's management was involved in Philidor's formation and decision-making.   Valeant's senior management, and even members of Valeant's Board of Directors, went on site visits to Philidor *before* the $100 million acquisition.   After the payment for the convoluted Philidor Purchase Option, Valeant concealed the transaction and Valeant's control over Philidor from investors and all healthcare sector stakeholders – including physicians, patients, private payors, and PBMs.

92.    Until the fraudulent arrangement was exposed in October of 2015, Valeant utilized

this hidden relationship to artificially inflate revenues and drive up the value of the Company's stock.  Because Valeant and its management knew that Valeant could not record revenue from shipping products to Philidor after Valeant's acquisition of Philidor, Valeant shipped millions of dollars of products to Philidor to inflate revenue directly before the purchase of the put-option.  Despite the fact that this manipulative practice clearly violated GAAP, Management Defendants Schiller and Carro, the Valeant Audit Committee, the Finance and Transactions Committee, and the entire Valeant Board of Directors approved the deceptive accounting practices involving Philidor.  During an October 26, 2015, investor conference call, Robert A. Ingram, a member of Valeant's Board of Directors since September 2010, admitted that the Audit Committee of the Board and the full Board of Directors approved Valeant's (misleading) accounting concerning Philidor.  Slides that corresponded to the investor call stated that the "Finance and Transactions Committee, Audit and Risk Committee and Full Board reviewed the transaction" and "[t]he appropriate accounting treatment was determined by management and reviewed with the Audit and Risk Committee."

### D.    Valeant Exploits "Patient Assistance Programs" To Raise Prices

93.    In addition to relying on its secret network of pharmacies to support its price-gouging model, Valeant also deceptively employed "patient assistance programs" ("PAPs") to support growth while raising prices.  PAPs are typically offered by drug companies to provide financial assistance to patients so that they can have access to medically critical drugs.  But Valeant's PAPS had an entirely different purpose.  Specifically, Valeant's PAPs waived patient copay requirements for Valeant's drugs – not to provide access to medically critical drugs, but instead to ensure that patients would not complain about being prescribed Valeant's branded and overpriced drugs rather than medically equivalent and far cheaper generics.  By eliminating copays, Valeant muted the incentive for patients to seek out lower-priced substitute drugs.  Thus,

Valeant could sell medically unnecessary branded drugs – despite the availability of low-cost generic substitutes – at an artificially inflated price. Had Valeant declined to waive the patient copays, patients would have chosen lower-cost generic drugs to avoid the unnecessary and costly prescriptions and thus would have lowered costs for the insurance companies. Valeant also concealed the Company's practice of waiving patient copays, keeping private insurance companies in the dark so that they would continue to pay for the Valeant-branded drugs even when unnecessary. Simply put, Valeant manipulated the PAP system to conceal the extent of its price increases from the paying public.

94. With respect to this scheme, Valeant specifically targeted private insurers because of federal anti-kickback laws that prohibit such practices when government payors are involved. Testifying before the House Oversight Committee and the Committee on Aging of the U.S. Senate ("Committee on Aging") on April 27, 2016, Pearson acknowledged that Valeant was "not allowed to" use the co-pay reduction programs for those on federal insurance programs. Senator Elizabeth Warren explained why: "These [co-pay reduction] programs are illegal [with regard to federal payors] because Medicare and Medicaid understand that the programs are scams to hide the true cost of the products from the consumer and drive up the cost of all the taxpayers." At the same hearing, Mark Merritt, President and CEO of the Pharmaceutical Care Management Association ("PCMA"), which represents PBMs, testified that Valeant caused third-party payors "to pay hundreds of thousands more for the most expensive brands" through copay coupons that allowed patients to bypass cheaper generic drugs.

95. From 2012 to 2015, Valeant's PAPs expenditures grew 11-fold, rising from $53 million in 2012 to over $600 million in 2015, with the expectation that PAPs expenditures would rise to over $1 billion in 2016. These rates grew even while the Company's revenues were

increasing at a significantly slower rate (roughly 3-fold), from $3.5 billion in 2012 to $10.4 billion in 2015.

96.    Throughout this period, Valeant misrepresented the true purpose of its PAPs program.  A draft Q&A directed Valeant employees to respond to the question of "Isn't Valeant just trying to make insurers and managed care providers pay as much as possible for these drugs?" with the following answer: "No.   These rate increases are essential to ensure that Valeant is able to continue to offer these important pharmaceuticals to our patients who are afflicted with Wilson's disease while also remaining commercially viable."  Valeant's production costs for these drugs had not increased in reality.  Valeant was instead using these price increases to chase additional revenue growth.  Despite the fact that Valeant's business model had eliminated nearly all spending on R&D, Valeant's customer service department lied to patients, claiming "there are many challenges associated with developing treatments for rare conditions such as Wilson's disease, the investments we make to develop and distribute novel medicines are only viable if there is a reasonable return on the company's investment and if our business is sustainable."

97.    When certain elements of Valeant's business model were revealed to the public in October 2015 (namely, the existence of the previously undisclosed Philidor relationship), Valeant spun further deceptions.  In a letter to Senator Claire McCaskill dated October 30, 2015, Pearson stated that Valeant was "beginning to reach out to hospitals to determine an appropriate pricing strategy" for those "institutions where the impact was significantly greater."   Despite these representations, and a 30% discount program that Valeant announced shortly after the letter to Senator McCaskill, investigators could not find a single hospital that received the discounts.

98.    A number of individuals, many who were affiliated with hospitals, testified before the Senate Aging Committee in or around April 2016 that they had not received any of the

promised discounts.  This was because Valeant had, in reality, maintained its price gouging well beyond October 2015 in a desperate attempt to generate further revenue growth.  By way of example, the Cleveland Clinic explained that it had called a then-vice president of Valeant, Brian Stolz, to inquire about the announced discounts.  Stolz stated that he would get back to the Clinic about the discounts, but Cleveland Clinic never received the promised follow up.  Likewise, the University of Utah Health Care wrote to the Senate Aging Committee explaining that "Valeant refused to talk [] about better contracted prices."  This, despite Pearson's October 2015 letter to Senator McCaskill indicating that Valeant would contact "hospitals that were impacted by the new pricing" to arrange pricing discounts.

99.     Subsequently, Valeant effectively admitted that Pearson's representation was inaccurate.  In an April 23, 2016, written response to the Senate Aging Committee, Stolz stated that, "[a]s of this date, Valeant has not entered into contracts with individual hospitals to provide volume-based discounts for Nitropress and Isuprel" and had executed contracts with only three hospital groups.  Thus, as of April 23, 2016, nearly half a year after Pearson's letter to Senator McCaskill, Valeant had done next to nothing to address the price increases.

## E.     The R&O Lawsuit and the Initial Disclosure of Valeant and Philidor's Fraudulent Arrangement

100.     Valeant's insatiable desire to expand its captive pharmacy network and grow its fraudulent scheme ultimately led to its demise.  Its acquisition of R&O Pharmacy would result in a lawsuit and investigation against Philidor that exposed the specialty pharmacy's relationship with Valeant and the related captive network of secret specialty pharmacies.

101.     As mentioned above, on December 1, 2014, Philidor acquired a specialized dispensary for gastroenterology patients, R&O Pharmacy, from Russell Reitz.  It became apparent to Reitz during the sale that Philidor was not licensed by the California State Board of Pharmacy.

Immediately following the sale, R&O began to receive a massive increase in prescriptions from physicians using Philidor's mail-order service. The number of prescriptions sent to R&O significantly exceeded the size of R&O's business prior to Philidor's acquisition of the pharmacy.

102. The orders, as discussed above, were consistently for expensive Valeant-branded pharmaceuticals, often ordered in bulk, which would be dispensed by Reitz through mail directly to patients. R&O would then receive payments from private health insurers, which frequently sent R&O single checks for more than $1 million covering hundreds of patients.

103. R&O Pharmacy's newfound business was unusual in at least three respects: (i) the volume of prescriptions that R&O filled through Philidor-directed patients was unusually large; (ii) the prices of the prescriptions were extremely high, even for a specialized pharmacy like R&O that frequently dealt in costly specialty drugs; and (iii) whereas most specialty pharmacies deal in treatments for chronic and serious medical conditions, the overpriced prescriptions that R&O was receiving from Philidor were for Valeant-branded drugs that treated common dermatological conditions such as Solodyn for acne, Elidel, for eczema, and Jublia, for toenail fungus, all of which could have been appropriately treated by any number of generic substitutes.

104. The significant change in R&O's business following the acquisition resulted in an audit from one of R&O's PBMs. The audit revealed that Philidor was using R&O to fill thousands of prescriptions for individuals all around the country, including patients with whom Reitz had never been in contact but whose prescriptions had been filled with his name and R&O's NPI. Even more confounding was the fact that many of the prescriptions that R&O had been credited with fulfilling were for medications that R&O did not carry, and some of those prescriptions had been backdated to before Reitz sold R&O to the Philidor-controlled entity. These fraudulent practices continued throughout the summer of 2015.

105.    Because of the serious concerns raised by the PBM's audit, in the summer of 2015, R&O began its own investigation into Philidor.  R&O's investigation uncovered Philidor's unsuccessful application for a pharmacy license with the California State Board of Pharmacy in 2013, which had been denied in 2014 by the California Board because Philidor's application contained "false statements of fact."  R&O's discovery of the previous unsuccessful application alerted Reitz to the fact that Philidor had purchased R&O exclusively to use R&O as a mechanism for Philidor to conduct business in California despite the California Board's denial of Philidor's pharmacy license application.

106.    In  a July 14, 2015, email to Eric Rice, the Isolani executive who signed the acquisition agreement with R&O (and who was also Senior Director at Philidor), Reitz raised "the issue of Philidor's improper, and perhaps illegal, use of [R&O Pharmacy's] number without [Reitz's] knowledge or consent to bill for prescriptions that" other pharmacies had filled and, in some cases, had even been billed before Isolani acquired R&O.  In the email, Reitz instructed Philidor to end the fraudulent practice immediately, and he noted that the acquisition agreement mandated that Philidor and Isolani (the Philidor-controlled entity through which Philidor acquired R&O) apply for a permit to operate in California – a "process [that] does not take 7 months." Accordingly, Reitz requested all documents concerning Isolani's or Philidor's application for a pharmacy license before the California State Board of Pharmacy.

107.    Five days later, on July 19, 2015, Philidor's CEO Davenport responded by email to Reitz.  In that email, Davenport stated that Philidor would cease using R&O's NPI number to fill prescriptions, and that Philidor had "halted activity pending coming to some alignment with you." In response, Reitz inquired why "Philidor is responding to my concerns instead of Eric Rice," who had signed the acquisition agreement by which Isolani acquired R&O Pharmacy. Reitz also noted

39

that he had recently learned Rice signed off on an audit that Reitz had refused to sign, despite the fact that "Rice is not the [pharmacist-in-charge] (I am) and has never stepped through R&O's doors.  I am not sure how he could verify the accuracy of anything pertaining to that audit."

108.    In response, and indicative of the severity of Reitz's concerns, on July 21, 2015, Philidor dispatched Rice and additional Philidor executives including CEO Davenport, Controller Fleming, and General Counsel Gretchen Wisehart to California to meet in person with Reitz at R&O.  Reitz's concerns on behalf of R&O were not resolved at the meeting, and R&O retained counsel who sent a letter to Rice on July 22, 2015, noting that Rice "appear[ed] to be engaging in widespread fraud."

109.    Several weeks later, on August 18, 2015, Philidor's Controller Fleming emailed Reitz to suggest responses to a pending audit.  One of the most prominent red flags identified in the audit was the fact that a large number of prescriptions R&O was filling were then shipped to patients in Pennsylvania, where Philidor was based.

110.    In light of the apparent widespread fraud, on August 31, 2015, R&O's counsel sent a notice of termination to Isolani's law firm, writing: "It is now crystal clear that Isolani/Philidor fraudulently induced Mr. Reitz to sign the [transaction] agreements in order to allow Isolani/Philidor to engage in a massive fraud. . . .  Isolani is simply a shell created by Philidor to perpetrate a massive fraud against not only against Mr. Reitz and R&O, but also the California State Board of Pharmacy, [and] various payer networks."  In the letter, R&O's counsel stated that Philidor was clearly using R&O for improper purposes because Philidor had been denied a California license.  Specifically, R&O's counsel stated that Philidor:

> targeted Mr. Reitz and R&O back in the fall of 2014 because it needed access to R&O's valuable multi-state pharmacy licenses and payer contracts . . . .  Philidor then created Isolani as the instrumentality to improperly use R&O's NCPDP and NPI numbers to distribute pharmaceuticals in jurisdictions that Philidor would not

have access to but for R&O. . . .  Mr. Reitz's worst fears have been realized, as he has obtained irrefutable proof that despite Mr. Davenport's written assurance, Isolani/Philidor continue to use R&O's . . . NPI numbers to bill payors for prescriptions dispensed by Philidor . . . Mr. Reitz now has concrete evidence that representatives of Isolani/Philidor have signed false and misleading payer audits and falsely represented themselves as officers or employees of R&O . . . to certain payors.

111.    Valeant, evidently realizing that Reitz's investigation of Philidor was endangering the Company's undisclosed business model, then intervened.  In response to the August 31, 2015 letter, Valeant's General Counsel sent letters to Reitz demanding $69 million in payments from R&O.  The letters demonstrate that Valeant was not only a drug manufacturer supplying Philidor, but in fact was at the center of a fraudulent scheme perpetuated in coordination with Philidor. Following Valeant's intervention, Isolani's counsel sent an email on September 6, 2015, notifying R&O's counsel that Isolani was seeking a protective order against Reitz and an accounting.  R&O's counsel responded to Isolani by stating that Isolani must have known for "at least six weeks that Mr. Reitz was in receipt of checks paid to his company to protect himself and his company from the massive potential/actual civil, regulatory and even potential criminal liability that your clients have exposed him to due to their malfeasance," also noting that R&O's counsel had outlined the illicit conduct in prior correspondence "to which your clients have provided no denials."

112.    R&O, through its counsel, then stated that it had not received any invoice from Valeant for any amount at any point in time, indicating that either Valeant and R&O are "victims of a massive fraud perpetuated by third parties," or that "Valeant is conspiring with other persons or entities to perpetuate a massive fraud against R&O and others."

113.    Reitz and R&O eventually filed suit against Valeant in October 2015.  The resulting disclosures, including the facts set forth above, precipitated a series of events that ultimately revealed the true nature of Defendants' and Philidor's fraudulent arrangements and the network of secret and captive specialty pharmacies.

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

114.    As described below, throughout the Relevant Period, Defendants made numerous false and misleading statements regarding Valeant's business model, financial condition and business prospects.   These misrepresentations were made in press releases, SEC disclosure documents, investor conference calls, direct communications with Plaintiffs, and by other means. The materially false and misleading statements had the effect of falsely increasing or maintaining the price of Valeant securities, including the securities purchased by Plaintiffs, and inducing Plaintiffs' purchase and retention of Valeant stock.   Similarly, the Management Defendants' materially false and misleading statements enabled Valeant to sell its various securities in secondary offerings and private placements at artificially inflated prices, including a primary offering in which Plaintiffs participated.

115.    Throughout the Relevant Period, Valeant and the Management Defendants presented Valeant as a profitable, organically growing, unique, and sustainable business.   The truth was vastly different.   During the Relevant Period, Defendants repeatedly concealed that Valeant: (i) depended on price gouging to sustain growth and profitability; (ii) sustained price gouging by using deceptive and illegal practices including a secret controlled network of pharmacies; (iii) could not maintain price gouging or more moderate price increases absent their deceptive and illegal practices; (iv) utilized deceptive and illegal practices implemented at Philidor and Valeant's other controlled network of pharmacies to reap the "benefits" of its alternative prescription fulfillment ("AF") program; (v) maintained inadequate compliance and internal control programs; and (vi) that their deceptive and illegal practices exposed Valeant to significant regulatory risk.

116.    More specifically, the statements detailed below omitted or denied the following information, which rendered them materially false and misleading:

42

117.   **Valeant's Business Model**:   Contrary to Valeant's public statements that its business model relied on "organic growth" primarily sustained by volume increases and cost savings, Valeant's true business model and success relied on price gouging.  Further, Valeant's true business model was dependent on using deceptive and illegal practices in an effort to sustain its price gouging and profitability.  The deceptive and illegal practices also inflated Valeant's already overstated volume growth.  These deceptive and illegal practices included: (i) routing prescriptions and patients through Valeant's secret network of pharmacies (including Philidor) which it controlled; (ii) altering prescriptions to prevent generic substitutes from being prescribed in favor of Valeant's brand-name drugs; (iii) utilizing its automatic refill program to ensure that patients were provided drugs they neither wanted nor needed; and (iv) submitting claims for payment from insurers and other third-party payors for the filling of prescriptions that the pharmacy seeking payment had not in fact filled.  As a result, Valeant's reported revenues, earnings per share, profitability, and future business prospects were dependent on its ability to conceal its deceptive practices and did not accurately portray Valeant's financial performance and business prospects.  These facts were all actively concealed by Valeant and its management from Plaintiffs and other Valeant investors.

118.   **Valeant's Relationship with Philidor**: Philidor was created with the assistance of Valeant and for the very purpose of benefiting Valeant by enabling Valeant to significantly increase the price of Valeant branded drugs despite the availability of lower priced alternatives. Valeant controlled and effectively owned Philidor.  Specifically, Valeant paid $100 million for the Philidor Purchase Option (*i.e.*, the ability to later buy Philidor for $0 at any point during the ten years after the acquisition of the option).  Further, numerous Valeant employees worked at Philidor, and Valeant even consolidated Philidor's results with its own.  When the truth of

Valeant's relationship with Philidor began to emerge, Valeant denied the impropriety of the relationship and the extent to which Valeant had relied upon the relationship to sustain growth in the past and anticipated relying on the relationship to increase growth in the future.  These facts were actively concealed by Valeant and its management from Plaintiffs and other Valeant investors.

119.   **Improper Revenue Recognition**: Just before executing the Philidor Purchase Option (whereby Valeant paid $100 million for the option to acquire Philidor to $0), Valeant improperly executed transactions, not in the ordinary course of business, with Philidor so that Valeant could record the revenue from those transactions as soon as the transaction was executed – violating a basic GAAP principle and causing Valeant's revenues, net income, and EPS to be materially misstated and inflated.  In short, Valeant stuffed the Philidor channel, a classic means of engaging in accounting fraud.  Further, after the Philidor Purchase Option, Valeant recognized those same revenues again when Philidor sold the drugs – thereby double counting revenue and further violating GAAP.  In addition, Valeant failed to disclose Philidor as a material variable interest entity ("VIE"), as require by GAAP.

120.   **Failure to Create Adequate Internal Controls:**  Despite repeatedly touting the purported strength and integrity of its internal controls in earnings calls and SEC filings, Valeant's internal controls were severely lacking.  In fact, Valeant has subsequently acknowledged that certain Valeant executives instituted an "improper tone at the top of the organization" and a singled-minded "performance-based environment" in which employees prioritize stock price appreciation and individual compensation over building a sustainable, legal long-term business and complying with applicable laws and contracts.

A.   **Misrepresentations Regarding Valeant's Business Model**

121.   Throughout the Relevant Period, Valeant repeatedly misrepresented the nature of

its business model.  In particular, Valeant repeatedly represented that it primarily relied on "organic growth" or volume increases, as opposed to price increases, to fuel its revenue growth. These statements were materially false and misleading because they concealed Valeant's reliance on price increases, sustainable only by virtue of an undisclosed network of controlled pharmacies, to support its revenue increases.  Investors, including Plaintiffs, considered the representation that Valeant was relying on volume-based growth to be material when making their investment decision.

122.    The Relevant Period begins on April 30, 2015, when Valeant filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2015, ending March 31, 2015 ("1Q2015 10-Q").  The 1Q2015 10-Q addressed Valeant's "lower risk" business strategy in the same manner as Valeant's previous 10-Qs, stating: "The growth of our business is further augmented through our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.  We believe this strategy will allow us to maximize both the growth rate and profitability of the Company and to enhance shareholder value."

123.    On May 19, 2015, Valeant held its 2015 annual shareholder meeting.  At that meeting, Pearson addressed Valeant's investors and made the following misrepresentations about Valeant's business strategy, the source of Valeant's revenue growth, Valeant's pricing model, and Valeant's stock price: (i) "we have a differentiated R&D model that has and will continue to deliver more innovative products to our customers at a lower cost than our competitors" as Valeant has "delivered three consecutive strong quarters of organic growth, 19% and 16% and 15% respectively"; and, (ii) Valeant possessed a "unique executive compensation system tied to generating disproportionate returns for our shareholders."

124.   On May 21, 2015, Pearson attended an RBC Capital Markets, LLC ("RBC") Investor Meeting on behalf of Valeant and issued the following representations about the Company, including that:

a.   due to managed care contracts Valeant was "***contractually not allowed to raise prices beyond,***" this time, an average of "***5%***" in the United States, including in Valeant's dermatology product line;

b.   in the Neurology and Other product line Valeant had "the most ability to raise price and play with price," as raising prices "is I believe not, at least from [an investor's] standpoint a bad thing," because orphan products provided Valeant with pricing flexibility although Valeant's base plan called only for 5% increases, which Valeant exceeded "if we can take advantage of – during times we've had significant price increases in acquisitions."  Pearson claimed that Valeant raised prices by acquiring drugs from companies "that did not price their product the right way";

c.   Valeant raised prices for Isuprel and Nitropress because Marathon, the entity Valeant acquired to add Isuprel and Nitropress to the Company's portfolio, left money on "the table."  Valeant explained that it raised prices only "because the drugs were mispriced vs. comparative products" and that price increases "can create lot of value for shareholders"; and

d.   "***organic growth is more volume than price and will continue to be.***"

125.   Roughly two months later, on July 23, 2015, Valeant released a press statement to announce its financial results for the second quarter of 2015 ("2Q2015 Financial Results"). Valeant also used this announcement to increase the Company's full year 2015 guidance and report that "Same Store Sales Organic Growth was 19%, driven by:  U.S. businesses, driven by the strength of dermatology, contact lenses, dental and Obagi."  That same press release quoted Pearson stating:

"We once again exceeded our guidance and delivered our fourth consecutive quarter of greater than 15% organic growth.  Our strong second quarter results were driven by outperformance in our U.S. businesses."

126.    Pearson, Rosiello and Kellen also hosted a conference call to address investors' and analysts' questions about the 2Q2015 Financial Results on July 23, 2015.  Pearson opened the conference call by stating:

> *We have now delivered four consecutive quarters of more than 15% same-store organic growth.  Strong performance throughout our businesses resulted in both our top and bottom line exceeding the Q2 guidance that we provided on our last call.*
>
> \*      \*      \*
>
> *Turning to organic growth, our overall same-store total company organic growth was 19% for the quarter.  The exceptional growth of our US businesses driven by the strength of dermatology,* contact lenses, dental and Obagi was complimented by many of our emerging markets including China, Middle East/North Africa, Russia and South Korea.
>
> \*      \*      \*
>
> *Jublia is now our second largest product with annual run-rates sales of approximately $450 million*…
>
> *Our US dermatology business had another excellent quarter* with our launch brands leading the way.  *Both launch and core brands contributed to the dermatology revenue growth of 55% year-on-year.  Jublia scripts grew 37% in Q2 versus Q1 . . .*

127.    Also on the July 23, 2015 conference call, Pearson responded to a question about the "extent to which [Valeant] envision[s] more pricing power" with the following statement:

> I think most pharma companies that I'm aware of, as the product gets into the last stages of their life, like Glumetza -- we're going to lose Glumetza within six months -- often price increases are taken at the end.  *So that was just consistent with what most companies do.*
>
> *Our view on pricing* -- across most of our portfolio, we do not take prices. Outside the US, there's like zero price.  I think, David, as we get more and more into segments like contact lenses and consumer products and other devices, we're not

able to take price.  So we're opportunistic when it comes to price.  ***But our base strategy is, how do we grow organically through volume, which is -- I think this quarter, we once again exhibited our ability to do so***.

128.    Shortly thereafter, on July 28, 2015, Valeant filed its quarterly report on Form 10-Q with the SEC for the second quarter of 2015, which ended June 30 of that year ("2Q2015 10-Q").  Pearson and Rosiello signed the 2Q2015 10-Q.  The 2Q2015 10-Q reported Valeant's revenues for the previous six months of 2015 as "$4.923 billion."  The 2Q2015 10-Q also stated:

> ***As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions*** in arriving at reported net product sales. Provisions for these deductions are recorded concurrently with the recognition of gross product sales revenue and include cash discounts and allowances, chargebacks, and distribution fees, which are paid to direct customers, as well as rebates and returns, which can be paid to both direct and indirect customers. . . . ***Provisions as a percentage of gross sales increased to 32% and 33% for the second quarter and first half of 2015, respectively, compared with 27% and 26% in the second quarter and first half of 2014.  The increase was driven by (i) higher provisions for rebates, chargebacks, and returns, including managed care rebates for Jublia® and the co-pay assistance programs for launch products including Jublia®, Onexton®, and Retin-A Micro® Microsphere 0.08% ("RAM 0.08%") . . .***

129.    The 2Q2015 10-Q also highlighted Valeant's purportedly "lower risk" business strategy stating: "The growth of our business is further augmented through our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.  We believe this strategy will allow us to maximize both the growth rate and profitability of the Company and to enhance shareholder value."

130.    The statements in ¶¶ 121-129 above highlighting Valeant's supposed volume increases, minimizing the impact that price increases played in Valeant's growth, representing that Valeant was contractually unable to raise prices more than 5%, and that Valeant had did not plan to implement further price increases were materially false when made because volume increases made up a small portion of Valeant's revenue growth, price increases made up a significant

majority of Valeant's revenue growth.  In fact, Valeant relied on double and triple- digit percentage price increases throughout the Relevant Period, contrary to its claims that "we do not take [increase] prices," and that Valeant's "base strategy" was not "how do we grow organically through volume," but rather the Company's business model was heavily dependent on steep price increases.  Moreover, in response to Pearson's statements regarding growth, Schiller emailed him on May 21, 2015 with the subject "price/volume," where he informed Pearson that his statement regarding volume growth was false.  Specifically, Schiller wrote "[l]ast night, one of the investors asked about price [versus] volume for Q1.  ***Excluding [M]arathon, price represented about 60% of our growth***.  ***If you include [M]arathon, price represented about*** __***80%***__ [of our growth]."

Pearson did not retract or correct his false and misleading statements about price and volume.  Five days later, on May 26, 2015, an analyst with RBC Capital Markets, LLC reported that a key takeaway from the meetings with Valeant management and Pearson in particular, was "volume not price is fueling organic growth." Additionally, Valeant was not "deliver[ing] more innovative products to [its] customers at a lower cost than our competitors," when the price increases Valeant employed were far beyond the industry norm, as embodied by its acquisition strategy targeting all products for which Valeant executives believed they could raise prices.  When describing the growth of dermatology scripts, including Jublia, Valeant and Pearson failed to disclose that this growth was only possible because through the use of the deceptive and illegal practices described above including in ¶¶ 117-118.  Moreover, Valeant in fact did "plan" for price increases in acquisitions, as the Company's entire business model was structured around, in part, acquiring pharmaceutical products for which it could raises prices.

### B.    Misrepresentations Concerning Philidor

131.    Valeant and its management created Philidor and a network of secret pharmacies controlled by Valeant in order to support the price increases and price gouging that Valeant relied

49

on to support its growth (reliance that, as described above, the Company hid from investors including Plaintiffs).  Philidor and the network of secret pharmacies controlled by Valeant engaged in deceitful and illegal conduct that resulted in patients receiving Valeant exorbitantly priced drugs rather than cheaper equivalents.  Further, Philidor and the network of secret pharmacies controlled by Valeant was created in order to circumvent other cost-controlling systems utilized by PBMs and other third-party payors.  In order to accomplish their fraudulent program, it was critical that Valeant and its management conceal Philidor's ties to Valeant.  Thus, Valeant and its management issued numerous false and misleading statements during the Relevant Period and violated relevant accounting rules in their public filings.

132.    Throughout the Relevant Period, Defendants chose to speak on the operations and supposed benefits of the alternative fulfillment ("AF") Program.   Contrary to repeated representations, Valeant's AF Program was not designed to help patients.  In fact, the program served to conceal the fraudulent scheme that Valeant and its management were running through Philidor and other Valeant-controlled pharmacies.  Defendants repeatedly failed to disclose that the AF Program was unsustainable, relied on deceitful and illegal conduct by Valeant, Philidor, and the network of secret Valeant-controlled pharmacies, and that such conduct was necessary to maintain or increase sales volume at the inflated prices Valeant had set.  Further, Defendants failed to disclose that the deceitful and illegal conduct could subject Valeant to significant regulatory and business risks.

133.    On April 30, 2015, Valeant filed its Form 10-Q for the quarter ended March 31, 2015 ("Q12015 10-Q"), signed by Pearson and Schiller.  The Q12015 10-Q represented that "pricing and sales volume of certain of our products . . . are distributed or marketed by third parties, over which we have no or limited control."  Until October 2015, when Valeant's control of Philidor

was revealed, Valeant made identical representations in its financial filings, all of which were signed by Valeant's senior executives.  For example, this exact statement also appears in Valeant's July 28, 2015 quarterly report on Form 10-Q ("2Q2015 10-Q"), signed by Pearson and Rosiello.

134.    The statements in ¶ 133 above that Valeant had "no or limited control" over the pricing and sales volume of drugs in the hands of third-parties were materially false and misleading because Valeant had created and was utilizing a secret network of controlled pharmacies precisely so it could control the pricing of its drugs.  As discussed below, Valeant created Philidor.  Valeant was Philidor's sole client.  Multiple Valeant employees worked *at* Philidor, and those employees viewed Valeant and Philidor as one and the same – because it effectively was.

135.    On July 23, 2015, Valeant hosted a conference call to discuss its 2Q2015 financial results.  During the call, a Wall Street analyst asked whether the number of prescriptions for a certain drug, Jublia, going through specialty pharmacy channels had improved.   In response, Valeant's Company Group Chairman, Kellen, misrepresented Valeant's alternative fulfillment program as well as the Company's control over the network of captive secret pharmacies, most prominently concerning Philidor, stating: "Yes, the adoption through multiple specialty pharmacies continues.  I think last time we said Jublia was around 50% and that trend continues. For derm overall, it varies by product, but it's around 40%."

136.    The statement in ¶ 135 above highlights the success of Valeant's AF program in increasing Valeant's growth was materially false and misleading when made.  Defendants failed to disclose that the AF program did not involve "multiple specialty pharmacies," and it did not simply focus on profitable scripts.  Instead, Valeant's AF Program consisted nearly entirely of routing prescriptions through a Valeant-controlled pharmacy, Philidor, which used a network of secret Valeant-controlled pharmacies and improper and illegal means to obtain reimbursement for

drugs that would have been rejected by independent pharmacies and third-party payors but for Valeant's use of Philidor and Philidor's improper actions.   These undisclosed practices inflated Valeant's financial figures and posed significant undisclosed business and regulatory risks – risk which came to fruition in the days, weeks, and months following the revelation of Valeant's control of Philidor.

137.   In December 2014, Valeant – through a little-known subsidiary called KGA – executed the Philidor Purchase Option agreement.   This transaction (without regard to the prior relationship) required Valeant to include Philidor in Valeant's consolidated financials. Nevertheless, Valeant continued to fail to disclose Philidor as a material consolidated VIE through October 2015.

138.   On April 30, 2015, Valeant filed its Form 10-Q with the SEC for the quarter ended March 31, 2015.  Pearson and Schiller signed the filing.  Valeant, Pearson, and Schiller represented that the financial statements contained therein "have been prepared by the Company in . . . accordance with U.S. generally accepted accounting principles ("U.S. GAAP") for interim reporting." The financial statements did not identify Philidor as a material consolidated VIE.  The 1Q2015 10-Q also included the false statement related to "Business Combinations" as found in Valeant's 2014 10-K.

139.   On July 28, 2015, Valeant filed its Form 10-Q with the SEC for the quarter ended June 30, 2015 ("2Q2015 10-Q").  As with the prior 10-Q, it was signed by Pearson and Schiller and contained the representation that the financial statements had been prepared in accordance with GAAP.  However, the financial statements did not identify Philidor as a material consolidated VIE.

140.     The statements described in ¶¶ 137-139 above were materially false and misleading when made because Valeant was Philidor's sole client and controlled and oversaw Philidor to facilitate the sale of Valeant's overpriced pharmaceuticals.  Additionally, Defendants had already concluded that Philidor was a material consolidated VIE, which triggered certain disclosure obligations under the Accounting Standards Codification Topic 810, Consolidation ("ASC 810").  Under ASC 810, Valeant was required to disclose its consolidated and unconsolidated VIEs, among other things, the nature of Valeant's relationship with Philidor (*e.g.*, the "nature, purpose, size and activities" and financing of Philidor) and the basis for consolidating Philidor (*e.g.*, the Philidor Purchase Option agreement as well as the assumptions and judgments supporting the consolidation and the financial impacts and risks resulting from Valeant's relationship with Philidor).  *See* ASC 810.  Indeed, in Valeant's presentation to investors and analysts on October 26, 2015, Valeant acknowledged that it considered Philidor a VIE prior to the acquisition of the Philidor Purchase Option.  To determine if Philidor was consolidated in Valeant's financial statements, the Company was required to determine whether Valeant was the "primary beneficiary."  Philidor should have been disclosed even though Valeant would later claim in the aforementioned investor presentation that the Company was not the primary beneficiary of Philidor until after Valeant had acquired the Philidor Purchase Option in December of 2014.  Even if Philidor were properly considered an unconsolidated VIE, ASC 810's guidance nonetheless mandated that Valeant disclose all material undisclosed VIEs.  Thus, Valeant was required to disclose its unconsolidated VIE relationship with Philidor because the Valeant-Philidor relationship was material.  Moreover, ASC 810 obligated Valeant to consolidate all VIEs for which Valeant was the primary beneficiary.  Because Valeant was Philidor's only client, Valeant was indisputably the primary beneficiary of Philidor even before acquiring the Philidor Purchase

Option.  Specifically, Valeant should have disclosed the following information in its pre-December 2014 financial statements: (i) quantitative and qualitative information concerning Valeant's involvement in Philidor, specifically Philidor's size, purpose, nature, activities, and financing; and (ii) Valeant's basis for concluding it was not the primary beneficiary of Philidor.  Instead, Valeant violated GAAP.

141.    Finally, Valeant's 10-Qs for the first quarter, filed on April 30, 2015, and second quarter, filed on July 28, 2015, each included an MD&A section.  In those MD&A sections, Valeant did not disclose Philidor as an alternative sales channel.

142.    Valeant's failure to disclose Philidor as a sales channel in the MD&A section was materially false and misleading when made.  The SEC's MD&A rules require Valeant to disclose the significant financial impact that closing Philidor ultimately had on Valeant's future financial results.  Valeant, however, concealed the effect that closing Philidor would have, releasing artificially inflated guidance to offset declines in Valeant's stock price as the public became aware of Philidor rendering patently unsustainable Valeant's reliance on the Philidor sales channel. Under SAB 104, Topic 13.B, Valeant was required to disclose Philidor as a distinct sales channel given that Philidor was a "[c]hanging trend[] in shipments into . . . a sales channel" that "could be expected to have a significant effect on future sales or sale returns." Specifically concerning Valeant's relationship with Philidor, Valeant failed to disclose: (i) Philidor's role in driving Valeant's revenue growth; (ii) the existence of Philidor as a separate sales channel; and (iii) the unsustainability of Philidor-channeled sales.  Valeant highlighted U.S. organic sales growth and sales growth in its dermatological products throughout the Relevant Period.  By third quarter 2015 Philidor had certainly emerged as a "changing trend in a sales channel" that was expected to have a significant impact on future sales:  Philidor was responsible for more than 7% of Valeant's

revenues. Accordingly, Valeant had a duty to disclose Philidor as a changing trend in a sales channel that "could" be expected—and in fact would be expected since there is no toher reason for Valeant to create Philidor—to have a significant effect on Valeant's sales.

143. SAB 104, Topic 13.B, provides specific examples of required MD&A disclosures concerning sales channels, and states that "changing trends in shipments into, and sales from, a sales channel or separate class of customer that could be expected to have a significant effect on future sales or sales returns" should be addressed in MD&A disclosures. In the Relevant Period, Valeant disclosed "Provisions to reduce gross product sales to net product sales" in its financial statements, but failed to disclose that these significant increases in provisions as a percentage of gross sales resulted from Valeant's deceptive and fraudulent practices, including routing patients into Valeant's secret network of captive pharmacies, rewriting prescriptions to insulate Valeant-branded drugs from generic substitutes, and the improper use of PAPs. Because Valeant concealed the existence of Philidor as a distinct sales channel, Valeant's reported growth was not indicative of future performance.

### C. Misrepresentations Regarding Revenue Recognition and GAAP Violations

144. In 2015, Valeant made material misrepresentations concerning its revenue and compliance with GAAP, as follows.

### 1. Material Misrepresentations Regarding Revenue

145. In 2015, Valeant reported the following revenues:

| SEC Filing | Financial Period | Revenue Reported (million) |
|---|---|---|
| 1Q2015 10-Q | 3 months ended March 31, 2015 | $2,146.9 |
| 2Q2015 10-Q | 6 months ended June 30, 2015 | $4,841.9 |
| 3Q2015 10-Q | 9 months ended September 30, 2015 | $7,590.1 |

146.    Valeant has admitted that these reported revenues were materially overstated because Valeant executed transactions with Philidor outside the normal course of business. Because Valeant's ability to collect revenue from these transactions was not reasonably assured, it should not have been recognized.  As conceded in Valeant's 2015 10-K, these transactions included "fulfillment of unusually large orders with extended payment terms and increased pricing, an emphasis on delivering product prior to the execution of the purchase option agreement and seeking and filling a substitute order of equivalent value for an unavailable product."

147.    These transactions were undertaken to improperly inflate revenue and related profit before the consolidation with Philidor, because Valeant knew that after consolidation it could not recognize revenue on deliveries of drugs to Philidor (and instead could only recognize revenue once the drugs were dispensed to patients).  Making matters worse, following the Philidor Purchase Option agreement in December 2014, Philidor recorded revenue from the sales of these same drugs when the drugs were dispensed to patients, despite the fact that the revenue had already been recognized by Valeant when it sent the drugs to Philidor.  Given that Philidor's financials were consolidated with Valeant's financials at this time, this resulted in a double counting of revenue for these transactions.

148.    In its March 21, 2016 Form 8-K, Valeant admitted that it had improperly booked revenue, and sometimes double-booked revenue, on drugs transferred to Philidor leading up to the Philidor Purchase Option agreement.  Specifically, the Company admitted that "[p]rior to consolidation, revenue on sales to Philidor was recognized by the Company . . . when the Company delivered product to Philidor."  Thus, the Company recognized revenue on these transaction on what is known as a "sell-in" basis.

149.    The Company's March 21, 2016 Form 8-K conceded this was improper accounting:

"The Company has determined that certain sales transactions for deliveries to Philidor in 2014 leading up to the option agreement **were not executed in the normal course of business** and included **actions taken by the Company in contemplation of the option agreement**."   The 8-K stated that the "revenue for certain transactions should have been recognized . . . when Philidor dispensed the products to patients [] prior to entry into the option agreement . . . ."   The Company further explained that certain revenue had been double-counted: "revenue that is being eliminated from 2014 **does not result in an increase in revenue to 2015** as a result of the Company having **previously also recognized that revenue in 2015**."

150.    Valeant's accounting treatment with respect to the drugs transferred to Philidor leading up to the Philidor Purchase Option agreement violated ASC 605-15-25-1.  The accounting treatment also runs counter to ASC 605-15-25-1.d, which does not allow revenue to be recognized on a "sell-in" basis where "[t]he buyer acquiring the product for resale" was "established primarily for the purpose of recognizing such sales revenue."  Accordingly, GAAP required Valeant to defer revenue and profit until Philidor actually sold the drugs to customers.

151.    As conceded by Valeant, this improper accounting scheme resulted in the material overstatement of reported revenues in 2015 as follows:

| SEC Filing | Financial Period | Revenue Reported (million) | Overstatement (million) |
|---|---|---|---|
| **1Q2015 10-Q** | 3 months ended March 31, 2015 | $2,146.9 | $20.8 |
| **2Q2015 10-Q** | 6 months ended June 30, 2015 | $4,841.9 | $20.8 |
| **3Q2015 10-Q** | 9 months ended September 30, 2015 | $7,590.1 | $20.8 |

152.    The revenues and profits generated through Philidor-funneled sales were critical to Valeant's growth and business model.

153.    An October 30, 2015 Morgan Stanley Research report estimated that 55% of Valeant's year-over-year growth in the United States was due to Philidor.  Likewise, Morningstar stated that "a significant portion of this revenue will evaporate as CVS and Express Scripts slash these specialty pharmacies from their network," and that Morningstar expected Valeant to only have an "organic growth rate in the low single digits over the next 5 years."  Had Valeant properly reported the Philidor transactions and relationship in accordance with GAAP, these lower growth expectations would have become apparent to investors well before October 2015.

### 2.    Material Misrepresentations Regarding Compliance with GAAP

154.    During the Relevant Period, various Defendants repeatedly represented in public statements and SEC filings that Valeant's financial statements had been prepared in compliance with GAAP.  These statements were false when made.

155.    In Valeant's 1Q2015 10-Q, Valeant and the Management Defendants represented that the financial statements had been "prepared by the Company . . . in accordance with U.S. GAAP for interim financial reporting."  Valeant and the Management Defendants made the same representation in Valeant's 2Q2015 10-Q and 3Q2015 10-Q.  Under Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), financial statements that a company files that do not conform to GAAP requirements are presumed misleading and inaccurate.  This presumption of inaccuracy exists for interim financial statements filed with the SEC.  *See* 17 C.F.R. § 210.10-01.

156.    At a May 21, 2015 RBC Investor Meeting, Pearson (appearing on behalf of Valeant) represented to investors that "our accounting practices are fine."  Pearson further represented that Valeant "gets audited all the time, by the SEC . . . and we have absolutely no issue from a government standpoint" and that Valeant "never had financial irregularities."

157.    On October 26, 2015, Valeant filed its 3Q2015 10-Q, in which it stated that "its

Audit and Risk Committee and the full Board of Directors have reviewed the Company's accounting for its Philidor arrangement and have confirmed the appropriateness of the Company's related revenue recognition and accounting treatment."   The 3Q2015 10-Q also contained the following misrepresentation: "***As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions in arriving at reported net product sales.  Provisions for these deductions are recorded concurrently with the recognition of gross product sales revenue and include cash discounts and allowances, chargebacks, and distribution fees, which are paid to direct customers, as well as rebates and returns, which can be paid to both direct and indirect customers. . . .   Gross product sales for products dispensed through Philidor Rx Services, LLC*** ("Philidor") pharmacy network (which is consolidated as a variable interest entity within our consolidated financial statements) *are recognized when a prescription is dispensed to a patient*."

158.   Also, on October 26, 2015, Valeant released a press statement, containing a representation from Pearson that: "[a]s we have said previously, our accounting with respect to the Company's Philidor arrangements is fully compliant with the law," and that Valeant "operate[s] our business based on the highest standard of ethics, and we are committed to transparency." In this same press statement, Ingram reiterated Pearson's statements, stating that the board of directors "***has fully supported the company's specialty pharmacy strategy***," adding that Pearson "***operates with the highest degree of ethics***."

159.   On October 26, 2015, Valeant's management and directors hosted a conference call to address the Philidor relationship.  During that call, Pearson stated that Valeant "operate[s] [its] business based on the highest standards of ethics and [is] committed to transparency.  We follow the law, and we comply with accounting and disclosure rules.  These values are the core of our

business model, and if I find examples of violations, I will not hesitate to take action."  Rosiello, who was also on the call, stated that the "finance and transactions committee, audit and risk committee, and full Board, all reviewed the [Philidor Purchase Option] transaction.   The appropriate accounting treatment was determined by management and reviewed with the Audit and Risk Committee."  On the same call, Board member Bob Ingram stated, on behalf of the Board, that "the Company stands by its accounting completely.  The audit committee of the Board and the full Board have reviewed the Company's accounting for the Philidor relationship, and have confirmed the appropriateness of the Company's revenue recognition and accounting treatment."

160.    On that conference call, Rosiello issued the following representations:

a.    "Valeant consolidates financials with Philidor and the Philidor network, ensuring that revenue recognition and financial statement presentation is appropriate";

b.    "Valeant recognizes revenue only when products are dispensed to patients, and Valeant records this at net realized price";

c.    "There is simply no way to stuff the channel of consolidated [VIEs], since all inventory remains on Valeant's consolidated balance sheet until dispensed to patients"; and

d.    "***Philidor was considered a VIE prior to the purchase option agreement***, but since Valeant was not determined to be the primary beneficiary, consolidation was not appropriate.  A purchase option agreement for Philidor was executed in December 2014.  ***The finance and transactions committee, audit and risk committee, and full Board, all reviewed the transaction.   The appropriate accounting treatment was determined by management and reviewed with the Audit and Risk Committee***."

161.    Carro, Valeant's corporate controller, also spoke on the conference call to defend Valeant's accounting and prior reluctance to disclose the existence of Valeant's control over

Philidor.  Carro specifically represented that: (i) as of year-end 2014, "Philidor is not considered to be material to Valeant's business for reporting purposes" because "GAAP requirement for disclosing sales to large customers is 10% of revenue" and Philidor's year-to-date net sales were only $111 million in December of 2014; and, (ii) for at least the first two quarters of 2015, "Philidor was not specifically mentioned in our disclosures because [Philidor] had not been material to the consolidated financial statements," as Philidor "represented 1% or less of total assets and 7% or less of consolidated net revenues since the fourth quarter of 2014."

162.     The statements described in ¶¶ 155-161 above were materially false and misleading when they were made because Valeant violated numerous GAAP requirements during the relevant time period.  Among other things, Valeant violated GAAP when it:  (i) failed to disclose Philidor as a VIE both before and after the Philidor Purchase Option agreement; (ii) failed to disclose Philidor as a "changing trend" for sales in Valeant's MD&A section; (iii) and improperly recognized and then double counted certain revenue on drugs shipped to Philidor in the lead up to the Philidor Purchase Option agreement.  Moreover, Valeant's price gouging was the driving force behind Valeant's revenue and profitability growth, and the Company was thus required to disclose the role of price gouging in Valeant's annual and quarterly reports.  Pearson himself testified on April 27, 2016 before the United States Senate that Valeant's growth from 1Q2013 to 3Q2015 was driven by price increases, not volume increases as Valeant and the Management Defendants had repeatedly represented to investors.  Valeant therefore was obligated to timely disclose its reliance on price increases as those price increases had a significant impact on the Company's reported revenues and earnings, and because Item 303 explicitly requires reporting issuers to report details in MD&A disclosures describing changes in volume or price that impact reported revenues.  Additionally, in SAB 104, the SEC Staff expressly states that an analysis of volume and price

changes affecting revenue are mandatory MD&A disclosures. Despite these obligations, Valeant and other Defendants concealed from and actively misrepresented to Plaintiffs and other investors the Company's dependency on price increases to sustain revenue growth during the Relevant Period. Finally, the SEC MD&A rules mandate disclosure of material events causing reported financial information to not necessarily indicate the direction of future operating performance. The unsustainable nature of Valeant's deceptive practices therefore obligated Valeant to make disclosures specifically noting the practices and associated risks that rendered Valeant's financial performance not indicative of future results. In violation of SEC rules during the Relevant Period, Valeant did not adequately disclose how increases or decreases in price and volume altered Valeant's revenue growth.

### 3.     Materiality of Accounting Misrepresentations

163.    SEC rules mandate that both quantitative and qualitative factors govern the materiality of financial statement items. *See* SEC Topic 1-M ("[T]here are numerous circumstances in which misstatements below 5% could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material."). SEC Topic 1-M explains that assessing materiality solely on a quantitative basis "has no basis in the accounting literature or the law," as the FASB "has long emphasized that materiality cannot be reduced to a numerical formula." Accordingly, each of the Defendants' misstatements in the Relevant Period, including various disclosure violations, were quantitatively and/or qualitatively material to investors because each misstatement or disclosure violation concerned central aspects of Valeant's business, operations, and prospects.

164.    Valeant restated its financial statements for, *inter alia*, the first nine months of 2015. These restatements disclosed that investors should no longer rely on Valeant's original financial statements. The financial restatements constitute an admission by Valeant that the

financial statements that the Company issued to investors during the Relevant Period were materially false and misleading, because a company need only correct historical financial statements when they are materially misstated. Furthermore, the material impact of Philidor on Valeant's revenue growth was revealed over the months that followed Valeant's closing of Philidor.

165.   Indeed, each of the Philidor-related misstatements and disclosure violations constituted qualitatively material misstatements, and this is true regardless of the size of the quantitative impact.  *See* SEC Topic 1-M.  Here, in the context of the misstatements at issue, Valeant itself admitted that the Company possessed an improper "tone at the top" and that its Controller and CFO engaged in "improper conduct" that directly contributed to the misstatements. Further, Philidor concealed the true nature of Valeant's sales trends throughout the Relevant Period, because Philidor was a key (and undisclosed) driver of Valeant's publicly emphasized revenue growth attributed to the dermatology product line.  Valeant repeatedly highlighted to investors the role that U.S. organic sales growth, specifically dermatology sales growth, played in Valeant's revenue growth, and Philidor was responsible for a material portion of that sales growth.

166.   SEC Topic 1-M also provides that "the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material."  When Valeant disclosed the existence of Philidor on October 19, 2015, the price of Valeant's stock plummeted by over 17 percent in just two trading days, demonstrating the materiality of the Philidor disclosure.  Indeed, *The Wall Street Journal* wrote on October 25, 2015, that "[w]hile Valeant may argue it didn't think the consolidation of Philidor was material, the market's reaction shows investors think otherwise. And since materiality is a qualitative, not a quantitative concept, the company shouldn't try to

63

stonewall with answers that try to purport that it wasn't enough of [Valeant's] assets to talk about it."

167.    Furthermore, SEC disclosure rules dictate that Valeant's MD&A disclosure violations and omissions were material, as SEC Release Nos. 33-8350, 34-48960, FR-72 provides that "Companies must provide specified material information in their MD&A, and they also must provide other material information that is necessary to make the required statements, in light of the circumstances in which they are made, not misleading."

168.    Every aforementioned MD&A disclosure violation and omission therefore either required additional MD&A disclosures on their own or necessitated additional MD&A disclosures "in light of" the existing MD&A disclosures that Valeant issued concerning revenue trends. Indeed, Valeant conceded the materiality of Philidor and the Company's price increases by issuing belated additional MD&A disclosures.

169.    Finally, Valeant's Forms 10-Q were materially false and misleading because they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations.  Item 303 of Regulation S-K mandates disclosures of such known factors.

### D.    Material Misrepresentations as to Valeant's Internal Controls

170.    In Valeant's various filings to the SEC, Pearson, Schiller and Rosiello repeatedly attested to the soundness of Valeant's internal controls and that the filings did not contain material misstatements or omissions of fact.  These statements were false and misleading when made because Valeant lacked adequate internal controls and compliance protocols and because there were numerous material misstatements or omissions of fact in Valeant's SEC filings.  As Valeant has admitted, the inadequate controls and fraudulent filings were the result of an "improper tone

at the top" that resulted in a single-minded focus on short-term revenue growth at the expense of legal, regulatory, and contractual obligations and risks.

171.    Valeant's management bore responsibility to establish and maintain effective internal controls over financial reporting and disclosure controls, as mandated under the Sarbanes-Oxley Act of 2002 ("SOX").  Specifically, Valeant management was required to conduct annual assessments of Valeant's financial and disclosure controls and issue a report on whether such controls were effective and free from material weaknesses.  SOX also required that management employ an appropriate framework for assessing Valeant's financial and disclosure controls.  *See* Committee of Sponsoring Organizations, Internal Control – Integrated Framework.  Indeed, Valeant's financial statements issued throughout the Relevant Period represented that management evaluated the Company's financial and disclosure controls based on the "COSO Framework."

172.    The COSO Framework states that the control environment determines the tone for the entire structure of internal control and influences all components of a company's business activity.  Therefore, the COSO Framework dictates that deficiencies that alter the control environment strongly indicate material weakness.  Indications of an ineffective control environment include: "[i]dentification of fraud of any magnitude on the part of senior management" and "[i]neffective oversight of the company's external financial reporting and [internal controls over financial reporting] by the company's audit committee."  Exchange Act Release No. 34-54976 (Dec. 20, 2006).  The accounting profession has widely adopted the concept of "tone at the top" as a means of analyzing the attitude and actions of a company's senior management regarding internal financial controls and the control environment.  The SEC has also recognized that "the most important factor contributing to the integrity of the financial reporting process" is "the corporate environment or culture within which financial reporting occurs." SEC

Staff Accounting Bulletin No. 99.

173.   For this reason, management's annual report assessing the effectiveness of the company's internal controls over financial reporting must disclose control deficiencies that constitute material weakness.  Material deficiencies include a "deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis."  Public Company Accounting Oversight Board Auditing Standard No. 5 ("AS 5").   Accordingly, Exchange Act Release No. 34-54976 precludes management from disclosing that it has assessed as effective its internal financial controls if there exist one or more control deficiencies that constitute a material weakness. Indicia of material weaknesses in internal controls over a company's financial reporting include the following: (i) identification of fraud, whether or not material, on the part of senior management; (ii) restatement of previously issued financial statements to reflect the correction of a material misstatement; (iii) identification by the auditor of a material misstatement of financial statements in the current period in circumstances that indicate that the misstatement would not have been detected by the company's internal control over financial reporting; and (iv) ineffective oversight of the company's external financial reporting and internal control over financial reporting by the company's audit committee.  *See* AS 5.

174.   On April 30, 2015, Valeant filed its 10-Q for the first quarter of 2015.  Pearson and Schiller both signed the 1Q2015 10-Q and represented that management's disclosure controls and procedures were effective: "Our management, with the participation of our [CEO] and [CFO], has evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2015.  Based on this evaluation, our CEO and CFO concluded that our disclosure controls and procedures were

effective as of March 31, 2015."

175.   Pearson and Schiller also signed Sarbanes Oxley Certifications for the 1Q2015 10-Q, as required under Rules 13a-14(a) of the Exchange Act.  The certifications provided that the 10-Q did not contain any untrue statement of material fact or omit to state a material fact. Pursuant to Rule 13a-14(a), Pearson certified the following statements in the 10-Q for the first quarter of 2014:

**CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER
PURSUANT TO RULE 13a-14(a)
AS ADOPTED PURSUANT TO
SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**
I, J. Michael Pearson, certify that:
1. I have reviewed this quarterly report on Form 10-Q of Valeant Pharmaceuticals International, Inc. (the "Company");
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of and for, the periods presented in this report;
4. The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a- 15(f) and 15d-15(f)) for the Company and have:
a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements tor external purposes in accordance with generally accepted accounting principles;
c. Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
d. Disclosed in this report any change in the Company's internal control over

financial reporting that occurred during the Company's most recent fiscal quarter that has materially affected, or is

reasonably likely to materially affect, the Company's internal control over financial reporting, and

5. The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions);

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Date: April 30, 2015

/s/J. MICHAEL PEARSON

176.     The same internal control statements and SOX certifications described above were contained in the 2Q2015 10-Q (signed by Rosiello and Pearson on April 30, 2015) and the 3Q2015 10-Q (signed by Rosiello and Pearson on July 28, 2015).

177.     The Company's 1Q2015 10-Q stated that Valeant's "management, with the participation of our [CEO] and Chief Financial Officer [], has evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2015.  Based on this evaluation, our CEO and CFO concluded that our disclosure controls and procedures were effective as of March 31, 2015." Similar representations were made by Valeant in the 10-Qs from the second and third quarter of 2015.

178.     As set forth in ¶¶ 171-177 above, Pearson's, Schiller's, and Rosiello's representations that Valeant's SEC filings did not contain material misrepresentations were materially false and misleading when made because each of those filings did contain material misrepresentations.

179.     Likewise, Pearson's, Schiller's, and Rosiello's certifications and representations

regarding Valeant's internal controls were also false and misleading when made.  As set forth in Valeant's 2015 10-K (filed April 29, 2016),

> **the Company's [CE O] and [CFO] have concluded that as of December 31, 2015, due to the existence of the material weaknesses in the Company's internal control over financial reporting** described below, the Company's disclosure controls and procedures were not effective to provide reasonable assurance that the information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to management as appropriate to allow timely decisions regarding require disclosure.

180.    The 2015 10-K reported that the Company had reached the same conclusion of ineffective internal controls as of March 31, 2015, June 30, 2015, September 30, 2015, and December 31, 2014.  The Company's 10-K for 2015, which Valeant filed with the SEC on April 29, 2016, admits that the Company possessed ineffective financial controls, which resulted in two distinct material weaknesses as of December 31, 2014: the improper "tone at the top" and the failure to detect the Philidor accounting fraud.  Accompanying its restatements on March 21, 2016, the Company also released the following disclosure, in which the Company admitted that there were material weaknesses in Valeant's internal financial controls throughout the Relevant Period:

> As a result of the restatement, management is continuing to assess the Company's disclosure controls and procedures and internal control over financial reporting. Management, in consultation with the committee, has concluded that one or more material weaknesses exist in the company's internal control over financial reporting and that, as a result, internal control over financial reporting and disclosure controls and procedures were not effective as of December 31, 2014 and disclosure controls and procedures were not effective as of March 31, 2015 and subsequent interim periods in 2015 and that internal control over financial reporting and disclosure controls and procedures will not be effective at December 31, 2015.

> \*    \*    \*

> [A]s part of this assessment of internal control over financial reporting, the company has determined that the tone at the top of the organization and the performance-based environment at the company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the company's improper revenue recognition and

the conduct described above.

### E.    Defendants' Continued Misrepresentations and Omissions as Their Scheme Unravels

181.    The truth concerning Valeant's true business operations and prospects gradually emerged through a series of partial disclosures that began in the fall of 2015 and did not conclude until after the end of the Relevant Period.  As the truth was gradually revealed, Defendants continued to distort and conceal Valeant's true state of affairs by downplaying and denying the truth that was being revealed to the market.

182.    **September 28, 2015**:  The relevant truth about Valeant's reliance upon price increases began to emerge on September 28, 2015, when *Bloomberg* reported that all Democratic members of the house Committee on Oversight drafted a letter to Chairman Chaffetz requesting that Chaffetz subpoena Valeant for documents concerning the massive price increases for two of Valeant's heart medications.  A day later, on September 29, 2015, a number of news organizations published reports stating that Congress was targeting Valeant because of Valeant's practice of purchasing older drugs and dramatically raising their prices, specifically focusing on the Marathon drugs, Isuprel and Nitropress, and that Valeant's inability to continue such practices could substantially impact its growth abilities.

183.    In response to this partial disclosure of Valeant's use of price-gouging practices, and the previously undisclosed regulatory and business risks such practices carried, the price of Valeant securities fell from $199 per share on Friday, September 25, 2015 to $158 per share on September 29, 2015, for a total decline of over 20 percent, on unusually high trading volume. The September 28, 2015, disclosure was only a partial one, however, because the extent to which Valeant relied upon price increases was not readily apparent, and most of the media attention concerned only two drugs:  Isuprel and Nitropress.

184.    Defendants immediately denied the truth of these criticisms, and in particular continued to misrepresent to investors that Valeant neither needed nor focused on price increases for its financial success.  Specifically, on September 28, 2015, Valeant filed a Form 8-K with the SEC that attached a letter from Pearson to the Company's employees to respond to the "two main issues worrying investors."   The "two main issues" were that Valeant's "business model and strategy is dependent upon large price increases in our U.S. pharmaceutical business" and "[c]oncern around our exposure to U.S. government drug price reimbursement."   In his letter, Pearson:

a.    referred to these concerns as a "bear thesis," claimed they were "incorrect on both accounts," and dismissed the dependency on price increases, stating, "***Valeant is well-positioned for strong organic growth, even assuming <u>little to no price increases</u>***.  As we have stated many times, ***Valeant's core operating principles include a focus on volume growth*** and a concentration on private and cash pay markets that avoid government reimbursement in the U.S." and "***the majority of our portfolio will continue to deliver strong volume-based organic growth and is not dependent on price increases***";

b.    purported to "lay out the facts" noting, in part, that: (i) growth in dermatology, ophthalmology, Rx and dentistry was based on having "delivered over 30% script growth year to date," and (ii) Valeant expected "double-digit script growth and corresponding revenue growth trends to continue" in the "Salix business"; and

c.    added "we expect double-digit organic growth in 2016 and beyond as we prepare for the launch of Addyi and anticipate other potential product approvals . . ."

185.    Pearson closed by noting that "[t]his is not the first time we have faced questions about our business model and strategy in the market, and it likely won't be the last," adding he

was "convinced we will continue to generate the best outcomes for our shareholders and the healthcare community."

186.    The statement in ¶ 185 that criticisms of Valeant were inaccurate, that the "majority of [Valeant's] portfolio" was "not dependent on price increases," that Valeant will "continue to generate the best outcomes for its shareholders," and the financial guidance issued to allay investor concerns were false and misleading when made for the reasons discussed in ¶¶ 117-118. Furthermore, representing that Valeant's "business model and strategy…[would] generate the best outcomes for [their] shareholders" concealed the Company's reliance on price increases, sustainable only by virtue of an undisclosed network of controlled pharmacies, to support its revenue increases.

187.    **October 4, 2015**:  Additional details concerning Valeant's use of price gouging were revealed on October 4, 2015 by *The New York Times* in a critical article addressing Pearson's letter to employees following the initial disclosure on September 28, 2015.  The article emphasized that Valeant had raised the prices on its branded drugs at a rate nearly five times that of its closest competitor.  Moreover, the article observed that exorbitant price increases on eight Valeant drugs produced roughly 7 percent of Valeant's revenue and 13 percent of the Company's earnings before taxes and interest in 2Q15.

188.    In response to *The New York Times* exposition of the severity of Valeant's price increases, including the observation that the price gouging spread well beyond the two Marathon drugs that initially captured public attention, Valeant's stock fell by more than 10 percent, to a close of $163 per share on Monday, October 5, 2015, trading on unusually high volume, from a close of $182 per share on Friday, October 2, 2015.

189.    **October 14-15, 2015**:  Shortly after the close of the market on October 14, Valeant

issued a press release disclosing the receipt of subpoenas from the U.S. Attorneys' Offices for the District of Massachusetts and the Southern District of New York, which requested documents concerning Valeant's pricing decisions, distribution of Valeant's products, PAPs, and financial support Valeant provided for its patients.  The press release firmly situated the disclosure as related to the previous disclosures about the severity of Valeant's price increases, noting that Valeant was reaching out to hospitals impacted by above average price increases.  On October 15, it was revealed to the market that Valeant was failing to fully cooperate with the Congressional inquiries into Valeant's price-gouging practices.  With this disclosure, Valeant's stock price declined by roughly 4.75 percent, to a close of $168 per share on October 15, 2015, trading on elevated volume, from a close of $177 per share on October 14, 2015.

190.    Even as Valeant disclosed the investigation, it sought to reassure investors, stating that "[a]ll of us at Valeant firmly believe in maintaining strong regulatory and financial controls and believe we have operated our business in a fully compliant manner."  This statement was false and misleading for the reasons discussed in ¶ 120.

191.    **October 19-20, 2015**:  During an October 19, 2015 conference call, the market first learned about Valeant's controlling interest in Philidor and the related secret network of captive specialty pharmacies.  On this conference call, Valeant disclosed for the first time its direct relationship with specialty pharmacies through which Valeant increased the price of Valeant's drugs and the volume of Valeant's sales.  Valeant disclosed the fact that it had acquired an option to purchase Philidor on this conference call.  Valeant also stated that pricing amounted to approximately 60 percent of its growth in 2014 and 2015 on this conference call.

192.    After the market closed on October 19, 2015, *The New York Times* reported that Philidor was not an industry-standard specialty pharmacy, but rather a Valeant-specific entity

73

employed by the Company to maintain the exorbitant prices of Valeant branded pharmaceuticals.

193.     In response, Valeant stock declined over the two-day period by roughly 16 percent, or $30 per share, trading on unusually high volume.  Notably, Valeant mitigated the extent to which its stock price fell by announcing earnings, which would later be restated due to material misstatements by Valeant.

194.     Upon the disclosure of Philidor, Defendants immediately sought to downplay the impact of Philidor and price increases.  Specifically, during a conference call on October 19, 2015, hosted by Pearson, Rosiello, and Kellen, Defendants continued to mislead investors about Valeant's business.  In reference to media and government scrutiny of Valeant's pricing practices, Pearson claimed that such criticism was an industry-wide problem and told investors that Valeant's forecast was appropriately discounted for such scrutiny, claiming:

> [I]t's clear that the pharmaceutical industry has been aggressively sort of attacked for past pricing actions.  And that's not just Valeant, but I think it's all companies. I do think given that environment, ***the pricing that pharmaceutical companies will take in the future will be more modest, and we built that into our forecast for next year***.

195.     In the slide deck presentation accompanying the earnings conference call, Valeant included a list of anticipated "Questions from Investors," inspired by a report revealing Valeant's ties to Philidor published by the Southern Investigative Reporting Foundation ("SIRF").  One of the "anticipated" questions was "How does Valeant work with specialty pharmacies and what is Valeant's relationship with Philidor," to which the presentation responded:

- We have viewed our relationship with Philidor and our other specialty pharmacies as proprietary and as one of our competitive advantages

- Similar to many pharmaceutical companies in the U.S., an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies

- We find specialty pharmacies improve patients' access to medicines at an affordable price and help ensure physicians are able to prescribe the

medications they believe most appropriate for their patients

\*   \*   \*

- We understand that Philidor:

  o   Provides services under our programs for commercially insured and cash-paying claims only.  Any claim that would be reimbursed in whole or in part by government insurance is not eligible for our co-pay subsidy programs

  o   Does not restrict prescriptions it fills to any particular manufacturers (including Valeant) [; and]

  o   Dispenses generic products as specified in patient's prescription or as requested by patient

196.    During the conference call, Pearson repeated some of the same assertions, stating that the relationship with Philidor had not been disclosed previously because the relationship was a "competitive advantage," and suggesting Valeant's use of specialty pharmacies was similar to its competitors and resulted in more affordable prices, stating, in part:

The topic of specialty pharmacies has not been a focus of ours on past calls because we believe this was a competitive advantage that we did not want to disclose to our competitors.  But given all the incorrect assertions by some, we will provide an update to this call.

***Similar to many pharmaceutical companies in the US***, an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies.  We find specialty pharmacies improve patients' access to medicines at an affordable price, and help ensure physicians are able to prescribe the medications they believe most appropriate for their patients.  In almost all cases, our inventory with specialty pharmacies in this channel and the title to our medicine only transfers to the pharmacy when the actual prescription is filled.

197.    Pearson also claimed that "[s]ince we do not recognize the revenue of our products [sold through Philidor] until the prescriptions are filled, this consolidation has the impact of delaying revenue recognition as compared to products that are sold through traditional distribution channels."  With regard to a lawsuit that had been filed by one of the pharmacies in the Philidor network, R&O, which had claimed fraudulent practices were being employed, Pearson reassured

investors that the business practices of Valeant and Philidor were proper by claiming:

> **R&O is one of the specialty pharmacies in our network**, and Valeant has shipped approximately $69 million at wholesale prices to them. This represents approximately $25 million at net prices. Any products R&O dispensed to patients were recognized as our revenues, and are reflected in our receivables. Any products still held by R&O are reflected in our inventory. **R&O is currently improperly holding significant amounts it receives from payers**. We will refrain from comment on active litigation, and **look forward to showing in court that we are owed the money**.

198.    During the same conference call, Rosiello discussed increased earnings guidance the Company released the same day and added that "[w]e expect our gross margins to approach 80 percent in the fourth quarter, driven by continued growth in our dermatology and Salix businesses, the launch of Addyi, and decreased sales of Xenazine." His statements were accompanied by the following chart in the slide presentation:

| | Previous Q4 2015 | New Q4 2015 | Previous full year | New full year 2015 |
|---|---|---|---|---|
| Revenues | $3.2 - $3.4 B | $3.25 - $3.45 B | $10.7 - $11.1 B | $11.0 - $11.2 B |
| Cash EPS | $3.98 - $4.18 per share | $4.00 - $4.20 per share | $11.50 - $11.80 per share | $11.67 - $11.87 per share |
| Adj. Cash Flow from Operations | NA | NA | >$3.2 B | >$3.35 B |

199.    To further alleviate investor concern, and artificially buoy the price of Valeant's securities, the slide presentation also revealed that Valeant was "reaffirming our expectations to exceed $7.5 [billion] EBITDA in 2016." When Pearson was asked during the conference call whether Valeant could still meet its EBITDA guidance in 2016 without "the benefit of price increases," he said, "[i]n terms of our EBITDA for 2016, I think we're only going to say today that we feel very comfortable with the $7.5 billion and we expect our guidance next year will exceed that."

200.    Valeant further increased revenue and EPS guidance for the fourth quarter of 2015

("4Q2015") and full year 2015.  Specifically, Valeant released the following guidance:

4Q15 Guidance
- ***Total Revenue increased to $3.25 - $3.45 billion [midpoint of $3.35 billion] from $3.2 - $3.4 billion [midpoint of $3.3 billion]***

- ***Cash EPS increased to $4.00 - $4.20 [midpoint of $4.10] from $3.98 -$4.18 [midpoint of $4.08]***

Full Year 2015 Guidance
- ***Total Revenue increased to $11.0 - $11.2 billion [midpoint of $11.1 billion from $10.7 - $11.1 billion [midpoint of $10.9 billion]***

   \* \* \*
- ***Cash EPS increased to $11.67 - $11.87 [midpoint of $11.77] from $11.50 - $11.80 [midpoint of $11.65]***

201.    Additionally, the press release contained the following quote from Pearson: "With our strong product portfolio and growth prospects, we feel very confident in our future outlook and we are reaffirming our 7.5 billion EBITDA floor for 2016."

202.    The company effectively conceded its non-traditional strategy was neither sustainable nor less risky by disclosing it would rely less on acquisitions and more on R&D, with Pearson adding that Valeant would be "making pricing a smaller part of our growth looking forward" and "will pursue fewer, if any, transactions that are focused on mispriced products." Valeant disclosed that it nearly doubled its R&D spending of $56 million in 1Q2015 to $102 million in 3Q2015, signaling the unsustainable nature of the non-traditional strategy and the illusory nature of the purported lower cost and more profitable business strategy.

203.    Also on the morning of October 19, 2015, Valeant released a press statement to announce financial results for the third quarter of 2015 ("3Q15").  The press statement announced: "Same store sales organic growth of 13%, 5th consecutive quarter of >10% organic growth, driven by:  Continued outperformance of U.S. businesses, particularly dermatology and contact lens. . . .

."

204.  **October 21-22, 2015**:  On October 21 and 22, 2015, the market learned additional details concerning Valeant's secret network of specialty pharmacies, including Philidor and R&O. On October 21, 2015, Citron Research published a report that called into question the independence of Philidor from Valeant, and highlighted Valeant's fraudulent accounting practices. The Citron report suggested that Philidor was not an independent pharmacy, and that Valeant had created an entire network of "phantom" specialty pharmacies to artificially boost Valeant's revenues by maintaining or increasing sales volume despite Valeant's implementation of otherwise unsustainable price increases.  The Citron report also covered the lawsuit R&O Pharmacy filed against Valeant, including R&O's accusation that Valeant was "conspiring . . . to perpetuate a massive fraud."  The publication of the Citron report resulted in a temporary halt on trading Valeant shares because of the precipitous decline in Valeant's stock price to a close of $118 per share on October 21, 2015, on extraordinary trading volume, from a close of $146 per share on October 20, 2015.

205.  On the evening of October 21, 2015, Philidor released a press statement announcing its contractual relationship with affiliated pharmacies, including R&O, and validating the Citron report's allegations that Valeant relied upon an entire secret network of captive pharmacies to sell the Company's overpriced branded-pharmaceuticals.  Before the market opened on October 22, 2015, BMO downgraded its rating of Valeant, and Valeant's stock price declined an additional 7 percent to close at $109 per share, on unusually high trading volume.  Over this two-day period of corrective disclosures, Valeant's stock price declined by $36 per share, or over 25 percent.

206.  Despite these revelations, Defendants continued to insist that there was nothing wrong with Valeant's accounting related to Philidor, and, in an October 21, 2015 press release

again claimed, falsely, that "sales are recorded only when the product is dispensed to the patient."

Specifically, Valeant stated:

- ***All shipments to Philidor and other pharmacies in the Philidor pharmacy network, including R&O, are not recorded in Valeant's consolidated net revenue. Sales are recorded only when the product is dispensed to the patient. All sales to Philidor and Philidor network pharmacies are accounted for as intercompany sales and are eliminated in consolidation. They are not included in the consolidated financial results that Valeant reports externally.***

- ***Any inventory at pharmacies in the Philidor pharmacy network are included in Valeant's consolidated inventory balances – there is no sales benefit from any inventory held at these specialty pharmacies and inventory held at the Philidor network pharmacies is reflected in Valeant's reported inventory levels.***

  *   *   *

- ***The timing of our revenue recognition by selling through the Philidor pharmacy network is actually delayed when compared to selling through the traditional wholesaler channel.***

207. **October 25-26, 2015**:  Additional disclosures covering Valeant's fraudulent arrangement with Philidor and its captive network of specialty pharmacies came to light on October 25 and 26, 2015.  First, on Sunday, October 25, 2015, *The Wall Street Journal* published an article detailing interviews with former Philidor employees, revealing that Valeant employees had worked directly at Philidor under fictitious names to conceal the relationship between the two companies "so it didn't appear [that] Valeant was using the pharmacy to steer patients" to Valeant products.

208.   On October 26, 2015, Valeant filed its 3Q15 10-Q and hosted a conference call, where Valeant expressly acknowledged for the first time that the Company possessed "the power to direct" Philidor's activities, making Philidor a "variable interest entity for which the Company is the primary beneficiary."  Valeant also announced that it was opening an internal investigation into the Company's relationship with Philidor and would create an ad hoc Board committee to

conduct the investigation.  The 10-Q stated that the board of directors had reviewed Valeant's

accounting for Philidor and had confirmed its appropriateness.  Specifically, the 10-Q stated:

> (a)     During the year ended December 31, 2014, the Company completed other smaller acquisitions including the consolidation of variable interest entities, which were not material individually or in the aggregate.  These acquisitions are included in the aggregated amounts presented below.  Beginning in December 2014, the Company has consolidated Philidor Rx Services, LLC ("Philidor") pharmacy network, which includes R&O Pharmacy, LLC.  The Company determined that based on its rights, including its option to acquire Philidor, Philidor is a variable interest entity for which the Company is the primary beneficiary, given its power to direct Philidor's activities and its obligation to absorb their losses and rights to receive their benefits.  As a result, since December 2014, the Company has included the assets and liabilities and results of operations of Philidor in its consolidated financial statements.  Net sales recognized through Philidor represent approximately 7% and 6% of the Company's total consolidated net revenue for the three-month and nine-month periods ended September 30, 2015, respectively, and the total assets of Philidor represent less than 1% of the Company's total consolidated entity on the Company's net revenues for 2014 was nominal.

209.    The 3Q15 10-Q also provided the following description of the Company's

performance:

> Excluding the items described above, we realized incremental product sales revenue from the remainder of the existing business of $236 million and $820 million in the third quarter and first nine months of 2015, respectively. *The growth, which incorporates sales directly to wholesalers and retailers as well as use of specialty pharmacies (primarily Philidor), reflected (1) higher sales of (i) Jublia®* (launched in mid-2014), (ii) the *Retin-A®* franchise (including the launch of RAM 0.08% in mid-2014), (iii) Xenazine®, (iv) Arestin®, (v) *Solodyn®*, and (vi) the Carac® franchise, and (2) higher sales from other recent product launches, including the launches of Biotrue® ONEday, Bausch + Lomb Ultra®, and Onexton®.

210.    The 3Q15 10-Q also contained the following statement describing Valeant's "lower

risk" business strategy: "The growth of our business is further augmented through our lower risk,

output-focused research and development model, which allows us to advance certain development

programs to drive future commercial growth, while minimizing our research and development

expense."

211.    Defendants once again attempted to downplay the role of Philidor and reaffirmed

their ability to hit their earnings guidance.  Specifically, on October 26, 2015, Pearson, Schiller,

Rosiello, Carro, and Kellen hosted an investor conference call with an accompanying presentation.

The presentation represented that "[o]ur specialty pharmacy strategy originated from the Medicis

Alternate Fulfillment Program." Among other things, the presentation represented that:

      a.    "Prescriptions through Philidor are less profitable than traditional channels

due to lower copay rates, lower cash pay rates and more cash pay scripts in Philidor than in retail

and other channels";

      b.    "***We do not own or control Philidor*** . . ." and "Philidor employees do not

report to Valeant . . .";

      c.    "***Philidor is independent*** . . ."; and

      d.    "Unless and until Valeant exercises the option to acquire Philidor, Philidor

remains independent and Valeant has no rights to remove CEO or management."

212.    The presentation also stated:

      a.    that "44% of Jublia revenue flowed through Philidor in Q3 2015";

      b.    that "we maintain regular communication, have a joint steering committee,

have rights (and have utilized them) to approve key positions (*e.g.*, in-house lawyer, chief

compliance officer), included Philidor in Valeant's SOX 404 Internal Control Testing and Internal

Audit program for 2015";

      c.    that "Valeant [has] contractual rights [to Philidor] including: Joint Steering

Committee, Right to require hires for certain positions, Substantial information rights, Covenants

respecting Philidor's compliance with all applicable laws"; and

      d.    in a section addressing Valeant's "Management Rights" over Philidor, that

"Valeant has the right (but not the obligation) to appoint or cause Philidor to hire: Advisor to the

CEO, Head Compliance Officer, In-House lawyer, Head IT officer, Other employees as reasonably requested."

213.    In addition to the above misrepresentations, Schiller reassured investors that Pearson was not responsible for any wrongdoing, stating "if I had any concerns whatsoever about Valeant or Mike, I would not have stayed on the Board.  It's as simple as that.  When we announced that I was leaving, and Mike and I had a bit of our lovefest, I don't want to repeat all the words but I meant them in terms of Mike is professional, his ethics, his work ethic, his commitment to doing the right thing."

214.    Pearson, too, spoke encouragingly about the Company's 2015 guidance, which had recently been increased.  He said, "Given the continued healthy growth in dermatology, Salix, eye health, and the recent Addyi launch, we expect to meet or exceed our fourth-quarter projections, excluding the one-time expenses associated with recent events." Further, Pearson assured investors that "there have been no issues with regards to the accounting or revenue recognition of the business," as "we still believe that the strategy of working with specialty pharmacies is sound and it's good for patients and physicians."  He continued to assure investors that there was no improper accounting stating:

    a.    "we stand by our accounting treatment of Philidor completely";

    b.    "the sensational claims made by the short seller Andrew Left, through his entity Citron, are completely untrue.  His motivation is the same as someone who runs into a crowded theatre to falsely yell fire.  He wanted people to run";

    c.    "after we saw the false report from Citron, we promptly coordinated with our outside regulatory counsel from Cahill to make a request that the SEC investigate Mr. Left and Citron";

d. "We have been working with outside counsel and we have found no evidence of illegal activity whatsoever at Philidor."

These statements were reinforced by Rosiello and none of the other Defendants who hosted the call objected to any of the representations made on the call.

215. Most notably, in a blatant attempt to convince investors that Philidor and the previously revealed price gouging would not interfere with the Company's earnings and growth, Pearson explicitly endorsed the prior 2016 guidance stating: "we continue to be ***very comfortable*** with our 2016 EBITDA expectation of greater than $7.5 billion."

216. Bloomberg reported on October 26, 2015 that Valeant's statements on the investor conference call "left investors skeptical" as Valeant "fail[ed] to answer critical questions on Valeant's continuing relationship with Philidor." Valeant's stock price dropped more than 5 percent following these corrective disclosures, to a close of $110 per share on Monday, October 26, 2015, trading on unusually high volume, from a close of $116 per share on Friday, October 23, 2015.

217. **October 28-30, 2015**:   From October 28 through October 30, additional information regarding the mechanism by which Valeant realized and maintained its price increases was revealed to the market.  Specifically, *Bloomberg* published an article on October 28 stating that Philidor relied upon "back door" tactics to increase payments and even expressly "instructed employees to submit claims under different pharmacy identification numbers if an insurer rejected Philidor's claim – to essentially shop around for one that would be accepted."

218. The following day, on October 29, 2015, *Bloomberg Businessweek* reported that Philidor had engaged in additional deceptive business practices to increase the sales volume of exorbitantly priced Valeant-branded drugs.  Specifically, *Bloomberg Businessweek* stated that

Philidor falsified prescriptions to boost Valeant sales, according to interviews with former Philidor employees and internal company documents. Furthermore, reports emerged that CVS Caremark, which was one of the country's three largest PBMs, terminated its relationship with Philidor in response to an audit of Philidor's practices. Valeant's stock dropped nearly 5 percent in response to these disclosures to a close of $111 per share on October 29, 2015, from a close of $117 per share on October 28, 2015, trading on unusually high volume.

219.    After the close of the market on October 29, 2015, the other two largest PBMs in the country, Express Scripts and OptumRx, announced that they also were terminating their relationships with Philidor. In response, Valeant issued a press release on the morning of October 30, 2015, before the market opened, declaring that the Company had terminated its relationship with, and would shut down, Philidor. In response to these disclosures, Valeant shares fell by nearly 16 percent to a close of $93 per share on October 30, 2015 from a close of $111 per share on October 29, 2015, trading on unusually high volume.

220.    **November 4-5, 2015**: Before the market opened on November 4, 2015, the United States Senate Committee on Aging announced the formal opening of a probe into Valeant's price gouging, including a request for relevant documents from the Company. Also on that day before the opening of the market, *Bloomberg* published a report that Valeant had intended to expand its reliance upon Philidor, which Valent could no longer do given the announcement that it was shutting Philidor. The *Bloomberg* report cast doubt on Valeant's ability to meet the financial guidance it had recently issued.

221.    Following the close of the market on November 4, 2015, *The Wall Street Journal* published a report that Ackman of Pershing Square, Valeant's largest shareholder, was strongly considering whether to liquidate his entire $3.8 billion stake in the company and had demanded a

full explanation from Valeant management concerning Philidor.

222.    Valeant's stock price declined by 19.5 percent over this two-day period, or $19 per share, and closed at $78 per share on November 5, 2015, trading on extraordinarily high volume.

### F.    Developments after the Relevant Period

223.    **November 10-12, 2015**:  Before the market opened on November 10, 2015, Valeant conducted a business update call to disclose the "significant" negative impact that Philidor's closing and the governmental probes would have on Valeant's business.  Pearson, Rosiello, Carro, and Kellen conducted this conference call on behalf of Valeant.  Valeant specifically revealed that the shuttering of Philidor would have significant "short-term" effects on Valeant's dermatology product lines, and that the Governmental probes were placing "short- term" pressure on the Company's neurology lines.  Valeant represented that the purpose of the conference call was to "update [investors and the market] on our strategy with respect to specialty pharmacies, to explain [Valeant's] transition plans for Philidor, to discuss our business performance for the first half of the quarter, and perhaps most importantly to take questions from all of [Valeant's investors]."  Pearson specifically stated that:

> *We began working with Philidor because we believed a strong relationship with one specialty pharmacy would deliver better, faster customer service for doctors and patients.  We were also looking for a pharmacy which would be willing to process prescriptions before adjudicating the claims, which would allow us rather than the patient, to assume the risk if the commercial payer denied the claim.*

224.    One analyst on the conference call noted that there were two fundamental "accusations aimed at the Company," the first regarding pricing and the second regarding Philidor and noted that Valeant "decided to limit [Valeant's] pricing going forward" and "cut operations with Philidor."  Pearson responded to the Philidor component of the question with the following statement:

Well Philidor was very specific. ***First, there was the Citron report which claimed financial fraud and other things. They quickly came out and there was no financial fraud, in terms of w h a t Valeant had to do***. But then other allegations were made in terms of the practices of Philidor. And we felt, both management and the Board felt that given these allegations, given what was happening to our stock price and given what many of our major shareholders were asking us to do that the best thing to do was to sever.

225.   After the market closed on November 10, 2015, reports emerged that one of Valeant's largest shareholders, Sequoia Fund, was offering to pay Philidor employees to receive information on Valeant's practices. *Bloomberg* then reported the next morning prior to the market's opening that Valeant's creditors were "[s]pooked" about a possible "revenue squeeze." Valeant's stock declined an additional 5 percent during the market day, closing at $78 per share on November 11, 2015.

226.   On November 12, again before the market opened, *Bloomberg* released another article covering Valeant's relationship with Philidor. Valeant's stock declined an additional 6.5 percent, closing at $73 per share. Over the three-day period of November 12 to November 15, Valeant's stock declined 13 percent, or $11 per share.

227.   **November 16, 2015**: On November 16, 2015, *Bloomberg* reported that Congressman Cummings had requested that Pearson make Valeant employees available for interviews before the United States House Oversight Committee. After the close of the markets on November 16, *The Washington Post* reported that the House Committee had announced it would hold a hearing early in 2016 on prescription drug pricing and was gathering information from Valeant in preparation for the hearing. The article also reported that the House Oversight Committee members urged Valeant's executives to testify at the hearing, and for the Committee to subpoena Valeant.

228.   **December 15, 2016**: On December 15, 2015, in a further attempt to convince shareholders that Valeant could be just as successful in a post-price gouging and Philidor world,

Valeant released a press statement announcing that it had entered into a deal with Walgreens to distribute Valeant's products.  The Walgreens deal included a 10 percent price reduction for Valeant-branded prescription-based dermatological and ophthalmological products, but Pearson nonetheless touted the partnership as a better option than Philidor.  In fact, Pearson was explicitly asked on CNBC whether investors "should [] expect [that the Walgreens partnership] will be the same sort of level of profitability and growth" as Philidor.  Pearson responded that the Walgreens deal "***more than replaces Philidor* . . . .**"  He further admitted that the Walgreens deal would rely on "volume increases" which he said that Valeant already largely relied on – thereby signaling to investors that Valeant would be able to execute on the Walgreens deal and avoid massive losses from the termination of the Philidor relationship.

229.    However, the next day, December 16, 2015, Valeant released a formal withdrawal of the inflated guidance issued less than two months before, on October 19, 2015.  The new guidance entailed a 4Q2015 revenue reduction from $3.25-3.45 billion to $2.7-2.8 billion; a 4Q2015 Cash EPS guidance reduction from $4.00-4.20 to $2.55-2.65; a 2015 full year revenue guidance reduction from $11.0-11.2 billion to $10.4-10.5 billion; a 2015 full year Cash EPS guidance reduction from $11.67-11.87 to $10.23-10.33; and, new 2016 EBITDA guidance reduction from $7.5 billion to $6.9-7.1 billion.  At Valeant's Investor Day on December 16, Pearson stated that he felt "***very comfortable with the guidance***.  But each little pieces [sic], I feel little less comfortable this year just given – **so [the management] *put an extra dose of conservatism in***" it.  In conjunction with the previously announced Walgreens deal, Valeant was painting a picture that it was still a financially healthy and sustainable business.

230.    Additionally, Pearson noted that "[the drug] Addyi . . . a lot of people have said, Addyi is a disaster; today you'll see it's not a disaster.  So we believe we'll sell between $100

million and $150 million in sales of Addyi next year."

231.    While Valeant and the Management Defendants issued revised guidance projecting increased growth for Valeant in 2016 and the later quarters in 2015, Valeant knew that it had already doubled the price of Addyi, a price increase which would decrease the likelihood that insurers would cover the medication or PBMs would approve the claims.  Indeed, Valeant knew that it had cancelled the Company's distribution agreement with Cardinal Health, increasing Valeant's reliance on Philidor for Addyi's distribution.  At the time that Valeant issued the increased guidance, Valeant also knew that the disclosure of Valeant's relationship with Philidor and the attendant investigations into Valeant's price gouging would decrease Valeant's sales, prices, revenue, and earnings.  Therefore, Valeant and the Management Defendants had no reasonable basis to believe, and in fact did not believe, that Valeant would achieve: (i) the 4Q2015 and full year 15 revenue of $3.25-45 billion, and $11-11.2 billion, respectively; (ii) 4Q2015 and full year 2015 Cash EPS of $4.00-4.20 and $11.67-87 respectively; (iii) full year 2016 EBITDA of at least $7.5 billion; (iv) full year 2016 revenue of $12.5-12.7 billion and Cash EPS of $13.24-75 or EBITDA of $6.9-7.1 billion.

232.    **December 17, 2015**:  Prior to the market opening on December 17, 2015, Mizuho cut its rating on Valeant stock from "buy" to "neutral," citing a lack of clarity regarding Valeant's recently announced agreement with Walgreens.

233.    **February 19, 2016**:  Media outlets on February 19, 2016 covered a Wells Fargo analyst report issued on February 18, 2016, addressing Valeant's disclosures following the Philidor discovery.  The Wells Fargo report questioned whether the Company had accurately disclosed the consequences Valeant would suffer as a result of Philidor's closing.  Specifically, the analysis noted that Valeant's "new guidance is not compatible with the data presented by Valeant"

concerning Philidor's importance and argued that Philidor was likely far more important to Valeant's guidance and future projections than Valeant's represented to the market.

234. **February 22, 2016**: A Wells Fargo analyst provided an update on the Wells Fargo report from February 19, adding two valuation models and suggesting a $62 price target. CVS also announced on February 22, 2016 that it would restrict the use of Jublia, one of the drugs that Philidor had most heavily distributed, and would instead require patients try a less expensive generic substitute first.  After the close of the market on February 22, 2016, *The Wall Street Journal* published a report stating that Valeant was likely to restate its 2014 and 2015 earnings due to discoveries made by an internal audit of its financials.  Also on that evening, Valeant issued a press release confirming it would restate its 2014 earnings by at least $58 million, reducing 2014 GAAP EPS by approximately $0.10.  Valeant stated that this restatement was necessary because the Company had previously improperly recognized revenue upon the delivery of products to Philidor, when Valeant should have instead recognized revenue only when the products were dispensed to patients.  Valeant also announced it would complete accounting and internal audit matters before filing its 2015 10-K.

235. **February 28-29, 2016**:  On February 28, 2016, Valeant released a press statement to announce Pearson's immediate return as CEO (he had been on medical leave), the appointment of Bob Ingram as Chairman of the Board, and to cancel a February 29, 2016 conference call.  The announcement also officially withdrew the Company's prior financial guidance and confirmed the delay in filing its 2015 10-K pending the ad hoc committee's review of accounting matters.  During market hours the following day, February 29, 2016, Moody's reviewed Valeant's ratings for a potential downgrade.  Also on February 29, 2016, Valeant confirmed that it was under investigation by the SEC and had received a subpoena during 4Q2015.

236.   **March 15, 2016**:  Before the market opened on March 15, 2016, Valeant released the Company's preliminary and unaudited 4Q2015 financial results and conducted a long- awaited conference call with investors and analysts.  On that call, Valeant disclosed that it was significantly decreasing its financial guidance for 2016, slashing its 2016 revenue guidance by 1.5 billion from $12.5-12.7 billion to $11-11.2 billion, reducing its Cash EPS guidance from $13.25-13.75 to $9.50-10.50, and cutting its EBITDA guidance from $6.7-7.1 billion to $5.6-5.8 billion.  Notably these revised figures were in fact revisions of revisions:  Valeant had issued the former numbers referenced above in December of 2015, as part of the Company's efforts to misrepresent the actual effect of closing Philidor on Valeant's business model.  Indeed, Valeant cited "reduced revenue assumptions for certain businesses, new managed care contracts and increased investment in key functions, such as financial reporting, public and government relations and compliance, as well as the impact of the weak first quarter of 2016" as the drivers of the Company's significant downward revisions.  On the conference call with investors, Valeant was forced to disclose inaccuracies even in the Company's release of guidance from that morning, as the forecast adjusted EBITDA for the next four quarters should have been $6.0 billion, rather than the $6.2 to $6.6 billion figure contained in the release.  Furthermore, Valeant reported expenditures in excess of $130 million relating to the closing of Philidor.

237.   **March 21, 2016**: On March 21, 2016, Valeant filed a Form 8-K, which announced the restatement of Valeant's prior financial statements.  In the announced restatement, Valeant disclosed that "approximately $58 million in net revenues relating to the sales of Philidor during the second half of 2014 should not have been recognized upon delivery of product to Philidor" following the Ad Hoc Committee's review of governmental and media- based criticism of Valeant's business model.  The restatement also disclosed that investors should no longer rely

upon Valeant's previous four financial statements, specifically the 2014 10-K, the 1Q2015, 2Q2015, and 3Q2015 10-Qs, and PwC's audit report on the 2014 10-K.

238.    Valeant's announced restatement disclosed that the Ad Hoc Committee had concluded that Valeant's revenue recognition "on a sell-in basis (*i.e.*, recorded when the Company delivered the product to Philidor)" prior to Valeant's acquisition of the Philidor Purchase Option was improper because "revenue for certain transactions should have been recognized on a sell-through basis (*i.e.*, record revenue when Philidor dispensed the products to patients) prior to entry into the option agreement."  As a result of the Ad Hoc Committee's conclusions, Valeant could no longer record revenues for shipments to Philidor, instead recording revenues only on shipment to the patient.

239.    Valeant also issued a March 21, 2016 press release, which stated that:

> "Management, in consultation with the [Ad Hoc] committee, has concluded that ***one or more material weaknesses exist in the Company's internal control over financial reporting and that, as a result, internal control over financial reporting and disclosure controls and procedures were not effective*** as of December 31, 2014 and disclosure controls and procedures were not effective as of March 31, 2015 and the subsequent interim periods in 2015 and that internal control over financial reporting and disclosure controls and procedures will not be effective at December 31, 2015."

240.    In the March 21, 2016 press release, Valeant also acknowledged that the Company's "improper revenue recognition" concerning Philidor was the result of "improper conduct" on the part of Valeant's former CFO and Former Corporate Controller.  Furthermore, Valeant specifically cited the unethical "tone at the top" perpetuated by senior management as a "contributing factor" to the Company's ineffective controls over financial reporting.  The Company's March 21, 2016 press release declared:

> "The ***improper conduct*** of the company's former chief financial officer and former corporate controller, which resulted in the provision of incorrect information to the committee and the company's auditors, contributed to the misstatement of results. In addition, as part of this assessment of internal control over financial reporting,

91

the company has determined that the ***tone at the top of the organization*** and the performance-based environment at the company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the company's improper revenue recognition."

241.    Finally, Valeant's March 21, 2016 press release stated that the Company would immediately commence the search for a CEO to replace Pearson, though Pearson would remain as CEO and Director until appointment of his replacement.

242.    **June 7, 2016**: On June 7, 2016, Valeant issued a press release and hosted a conference call regarding the Company's long-delayed 1Q16 financial results.  The Company reported a GAAP loss per share of $1.08 and significantly lowered its 2016 guidance and revealed that the poor financial results and outlook were caused, in large part, by the loss of Philidor.  For example, Rosiello stated that sales volume declines were "exacerbated by the loss of refills following the shutdown at the end of January of our previous specialty pharmacy relationship." Joseph Papa, the Company's new CEO, added that with respect to dermatology, "a significant portion of our Walgreens prescriptions have profitability significantly below our internal projections and meaningfully below non-Walgreens prescriptions" and that "[i]n some instances, these prescriptions actually have a negative average selling price.''

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

243.    As addressed above, the Defendants operated an elaborate scheme spanning years to defraud investors by issuing false and misleading statements about Valeant and its financial and operating performance.  Valeant defrauded PBMs, physicians, and insurers through secret and illicit practices intended to boost the sales and prices of Valeant-branded products.   The Management Defendants were personally aware of the deceptive and fraudulent practices detailed herein, as the Management Defendants designed and implemented those practices. Moreover, due to their frequent meetings and their effective control over, and contractual right to review and

approve, Philidor's records and policies, the Management Defendants were either personally aware of, or were severely reckless in disregarding, the improper and deceptive tactics that Philidor employed. The Management Defendants also possessed significant motives to engage in, design, and implement the aforementioned fraudulent conduct. The facts below further demonstrate the Management Defendants' scienter.

### A.    Valeant's Admission of Improper Conduct

244.    Valeant has already admitted the falsity of several of the Management Defendants' statements from the Relevant Period.

245.    For example, on February 22, 2016, Valeant released a press statement admitting that the Company had improperly recognized Philidor-related revenues. One month later, on March 21, 2016, Valeant issued another press release, this time accompanied by a Form 8-K, to disclose that Valeant had material weaknesses in internal controls and that Valeant's 2014 10-K and 1Q2015, 2Q15, and 3Q2015 10-Q's could no longer be relied upon.

246.    Moreover, Valeant concluded that Schiller had engaged in "improper conduct" and "that the tone at the top of the organization and the performance-based environment . . . may have been contributing factors resulting in improper revenue recognition."

247.    Finally, Valeant asked Schiller to resign from the Board and forced Pearson and Carro out of the company.

### B.    The Management Defendants' Role in Valeant's Business Strategy

248.    The Management Defendants were active and culpable participants in the fraudulent scheme alleged herein because they received information reflecting the truth regarding Valeant, controlled and received Valeant's materially misleading misstatements, and, by virtue of their positions within Valeant, were privy to confidential and proprietary information regarding the Company's unsustainable business model and its reliance on deceptive practices. The fraud

was pervasive, multi-faceted, and carefully designed.  Such a sophisticated and wide- ranging fraudulent scheme could not have been orchestrated for such a long period without the knowledge of or extreme recklessness by the most senior personnel at the Company, including the Management Defendants.  This is particularly true where, as here, the Management Defendants were actively involved in the day-to-day operations of the Company.

249.    For example, Pearson's management style, as reported by *Bloomberg Businessweek*, ensured that he would know of the Company's fraudulent practices.  Pearson "had his fingers in everything, from operations to making decisions about the salaries of individual employees," and actively "micromanaged things he deemed important."  Further demonstrating his involvement in the wrongdoing, Pearson admitted in a written statement to the United States Senate that, "as [Valeant's] leader, [he] was too aggressive in pursuing price increases on certain drugs."

250.    Pearson also worked closely with the other Management Defendants.  For example, he held a call each Tuesday at 11:00 a.m. with all the leaders of Valeant's business, during which Valeant's senior management discussed opportunities, assessed the business, addressed developing issues, and attempted to ensure that the Company did not face any surprises at the end of each quarter.

251.    Another of the Management Defendants, Schiller, acknowledged his and Pearson's active involvement in and awareness of Valeant's strategy.  For example, Schiller revealed his and Pearson's hands-on approach, and therefore inference of scienter, when he disclosed on a May 28, 2014, conference call with investors that he and Pearson "religiously track each deal on a quarterly basis.  Our Board of Directors receives a report every quarter on each deal.  We review every quarter and ask ourselves how are we doing.  We are our own biggest critics."  Later that same

day, Pearson bragged to investors and industry specialists at the Sanford C. Bernstein Strategic Decisions Conference that Valeant was "tracking every product around the world."

252.    Valeant documents, interviews with former Valeant/Philidor employees, and sworn testimony further demonstrate that the Management Defendants were directly engaged in the business, including Valeant's pricing strategies for individual products.  For instance, when Valeant added Isuprel and Nitropress to its orphan drug portfolio, Pearson, Schiller, Kornwasser, Davis, Steve Sembler (the Company's former Senior Vice President of Neurology and Other), and Sandeep Lalilt (the Company's Senior Director of Marketing) all participated in a meeting to discuss the pricing of the newly-acquired drugs.  Prominent newspapers, including *The Wall Street Journal*, reported that Pearson intended to implement drastic price increases to attain Valeant's profit targets.  At his hearing before the United States Senate, Schiller testified that, despite the recommendation of the rest of the group, "Pearson made a decision to go with the higher price."

253.    The Management Defendants also represented themselves to investors as the persons most knowledgeable about Valeant's business, operating model, strategies (including pricing, the AF initiative, and specialty pharmacies), acquisitions, organic growth, internal controls, ethical standards, compliance programs, and the volume, pricing, and performance of Valeant's products.  The Management Defendants voluntarily and repeatedly chose to speak on these topics, so they either knew or recklessly disregarded the fact that their statements were materially misleading.

254.    For example, during a May 21, 2016, RBC Investor Meeting, Pearson discussed Valeant's stock price, stating "[w]e expect our stock to go up 50%, 70% a year, that's our expectation, that's what I get paid to do and our long-term investors appreciate it."  He also said "I believe that our company is fundamentally undervalued" and that "last year when we were

trading at 105 it was so obvious to me that we were so undervalued why wouldn't all you guys

rush in?  Not just you guys but I mean investors clearly we weren't worth 105."

255.    Similarly, when Allergan called into question Valeant's pricing practices in mid-

2014, Pearson and Schiller vigorously refuted these allegations and claimed Allergan lacked the

knowledge about Valeant's business which both Pearson and Schiller possessed.  For example, on

July 21, 2014, the Company announced it had contacted Quebec and U.S.  regulators regarding

Allergan's "false and misleading statements regarding Valeant's business," including assertions

by Allergan in "an SEC filing that Bausch + Lomb's pharmaceutical sales were stagnant or

declining."  In the same release, Pearson stated:

> We can no longer tolerate unjustified attacks on Valeant's business and strongly
> believe we are obligated to take action to protect Valeant shareholders from
> Allergan's apparent attempts to mislead investors and manipulate the market for
> Valeant stock. . . . Allergan's continued disparagement of Valeant and repeated
> questioning of Bausch + Lomb's performance demonstrate their fundamental lack
> of knowledge about Valeant's business. . . .
>
> Finally, we do not believe that it is productive for either company to conduct due
> diligence in a public forum and although we have consistently offered Allergan the
> opportunity to conduct due diligence on our business, its management and board
> have refused, and have instead chosen to make misrepresentations and false
> statements about our business.

256.    Additionally, Pearson, Schiller, and Rosiello were responsible for obtaining the

knowledge necessary to ensure the Company's disclosures to the market were true when executing

SOX Certifications.  Pearson, Schiller, and Rosiello either drafted, prepared, or approved Valeant's

various SEC filings, releases, and other public statements, as evidenced by their signatures and

their managerial control over the information disclosed within those statements.

### C.    The Management Defendants' Decision to Close Philidor

257.    The Management Defendants designed, implemented, or possessed knowledge of

Valeant's reliance upon Philidor and the related secret network of captive pharmacies to artificially

inflate Valeant's growth rates until Philidor's closure in late 2015.  The Management Defendants also knew that Valeant was concealing its relationship with Philidor, because the Management Defendants were involved in the acquisition of Medicis and developed the "alternative fulfillment" strategy initially employed only for Medicis pharmaceuticals that led to the formation of Philidor on January 2, 2013.

258.    Indeed, Valeant announced the hiring of Kornwasser on January 3, 2013, one day after the formation of Philidor.  Kornwasser and Tanner served as Valeant's primary points of contact at Philidor and reported to Pearson (Kornwasser directly, Tanner through Kornwasser). The fact that Kornwasser received $8.8 million in total compensation in his first year of employment evidenced the central role that Philidor was intended to serve in Valeant's business model.

259.    Furthermore, Pearson, Schiller, and senior management signed the Philidor agreements and frequently discussed the benefits of Valeant's new "alternative fulfillment program" with investors, while misrepresenting the true nature of that program.  The Management Defendants knew that numerous Valeant employees assisted in the formation of Philidor and subsequently worked at Philidor under aliases in order to conceal the connection between Valeant and Philidor.

260.    Prior to purchasing the option to acquire Philidor, Pearson, Schiller, and Valeant's Board of Directors performed extensive due diligence of Philidor.  Notably, prior to the purchase of the option, the entire Audit and Risk Committee of Valeant's Board personally toured Philidor's facility in Pennsylvania.  Valeant thereby gained further additional knowledge about Philidor's business practices and operation.  After Valeant paid $100 million to acquire the option to purchase Philidor (for $0), Valeant failed to disclose – and, in fact, actively concealed – its relationship with

Philidor, including in Valeant's financial statements.  Valeant's entire Board of Directors also reviewed and affirmatively approved the Philidor transaction and Valeant's accounting treatment of that transaction, despite the fact that the accounting practices violated GAAP.

261.    Because Valeant possessed actual control over Philidor from the day it was created, the Management Defendants were at minimum aware of, or they were specifically involved in designing, Philidor's role in facilitating Valeant's fraudulent revenue-inflating scheme.  Valeant held a contractual right to inspect Philidor's books, records, and facilities, and to audit Philidor's practices.  Valeant either conducted such an audit and knowingly approved of Philidor's deceptive practices so long as they benefited Valeant, or it recklessly failed to conduct such an audit with the knowledge that Philidor's deceptive practices were best ignored as they benefited Valeant's revenue.  In fact, Philidor employees have confirmed that the deceptive practices within Philidor were widely known (within Philidor), discussed, and even documented in Philidor's training manuals, demonstrating that any audit would have revealed the wrongdoing to Valeant.  Moreover, Valeant's internal control testing and internal audit program in 2015 included Philidor, and Valeant and Philidor created a joint steering committee guiding Philidor's strategic plan, contractual obligations with insurers, and "internal policies, manuals, and processes."

262.    Contemporaneous email correspondence confirms that Pearson personally monitored or directed Philidor's business practices.  For example, in an email sent by Kellen to Pearson on March 9, 2015, Kellen stated "Met with Deb [Jorn]. . . .  Suggested we get all the [District Managers] in for a day . . . goal to go over the practices in each district where Philidor is working well and identify next [approximately] 10 practices where we should push harder to build it out.  That will help fuel growth."  Pearson responded, "Good stuff."  Additionally, Valeant's management invited Philidor managers to meet Valeant's Board of Directors in July 2015.

263.   Valeant and the Management Defendants also closely monitored the network of pharmacies through which Philidor operated.   For example, when R&O Pharmacy withheld invoices from Valeant because of R&O's suspicions about fraudulent conduct involving Philidor, it was Valeant's general counsel that sent a letter to R&O's owner demanding "immediate payment."

264.   When the details of Philidor's relationship with Valeant first began to emerge to the market, the Management Defendants further revealed their intimate knowledge of Philidor's operations.   For example, on October 19, 2015, Pearson, Rosiello, and Kellen held a conference call with investors in which they defended Philidor (and Valeant's failure to disclose Philidor) as Valeant's "competitive advantage that we did not want to disclose to our competitors."   On another conference call a week later, on October 26, 2015, Pearson stated that Philidor was "independent" and sales through it were "less profitable."   Valeant announced four days later that Philidor would cease operations due to Philidor's improper practices.   The fact that the Management Defendants elected to shut down Philidor only four days after declaring it was in fact "independent" and "less profitable" illustrates that the Management Defendants were already well aware of Philidor's deceptive and illegal practices and further investigation was unnecessary.

265.   The Management Defendants' knowledge of Philidor's illicit practices is also apparent from Pearson's repeatedly highlighting the benefits of Valeant's "alternative fulfillment" strategy while simultaneously refusing to provide meaningful details to investors or the public. Pearson himself admitted that it was a conscious decision to conceal Valeant's relationship with Philidor for supposed "competitive" reasons.

266.   Additionally, Pearson, Ingram, and Carro each publicly defended Valeant's accounting in an attempt to refute Citron Research's report, which suggested that Valeant

artificially boosted its revenue through Philidor.  Ingram represented on an October 26, 2015, conference call with investors that the entire Valeant Board and Audit Committee had reviewed and confirmed as appropriate Valeant's accounting practices concerning Philidor.  But when the SEC opened an investigation into Valeant's relationship with Philidor, the Board asked Carro and Schiller to step down because they had engaged in "improper conduct" concerning Valeant's accounting of Philidor-related sales.  Valeant later admitted, as described in ¶ 119, that it needed to restate its prior financial statements because, among other things, it improperly inflated revenues through Philidor by double-booking revenues – a blatant violation of GAAP.

267.    Philidor's efforts to conceal its improper conduct further indicate the Management Defendants acted with scienter, given the effective and actual control Valeant exerted over Philidor.  Reuters reported that, in September 2015, "Philidor began requiring employees to sign confidentially agreements" that would enable "the pharmacy to sue workers who divulged information about its activities."  The timing of Philidor's adoption of confidentiality agreements, immediately following R&O's threat to sue, illustrates Philidor's efforts to conceal wrongdoing.

### D.    Valeant's Refusal to Pursue Remedies Against Individual Wrongdoers

268.    The strong inference of scienter is further supported by the fact that Valeant declined to pursue remedies (such as incentive pay "clawbacks") against Pearson, Schiller, Philidor, and the Philidor executives that engaged in the fraudulent conduct.

269.    Valeant's failure to take remedial action was not for lack of options.  In fact, in 2014, Valeant instituted a "clawback" policy that allowed the company to take back an executive's incentive compensation if a restatement was required within three years of the Relevant Period and the executive was found to have participated in any fraudulent or illegal conduct.  Valeant did not pursue that remedy here – after all, the Company had approved of the fraudulent conduct.  In fact, as Ingram revealed, the Board approved the accounting for Philidor.  Thus, notwithstanding

the clawback right, Valeant only terminated the employment of the wrongdoers and closed Philidor.

270.    Rather than pursuing a clawback, a month after announcing Pearson would be replaced as CEO, Valeant paid Pearson even more money – effectively a multimillion dollar gratuity.  Valeant retroactively modified Pearson's employment contract to provide him with a $2 million salary for 2016, in addition to other financial benefits, despite the fact that Pearson was entitled to only a performance bonus, but no salary, in 2016.  Valeant has since given Pearson a $9 million severance package.

271.    In addition to failing to enforce the clawback provisions, Valeant also failed to enforce broad indemnification rights against Philidor.  Specifically, the Philidor Purchase Option that Valeant acquired stated that Philidor "shall indemnify, defend, and hold harmless" Valeant "from and against all Losses" that Valeant suffered "as a result of the operation of the Pharmacy or the performance by the Pharmacy of its duties."  However, the Philidor Purchase Option agreement included a provision that any such indemnity liability "shall be reduced to the extent . . . that such Losses are caused by or arise out of . . . the negligence or intentional misconduct of Manufacturer."  Tellingly, rather than pursue its indemnification claim, Valeant entered into a mutual release with Philidor, effective November 1, 2015.

### E.    Congressional Hearings and Federal Investigation

272.    Congressional committees started investigating Valeant's business practices late in the summer of 2015, and many of the admissions made during these investigations and hearings further support an inference of scienter.

273.    In connection with a February 4, 2016, House Oversight Committee Hearing, Valeant produced 75,000 pages of documents to the House Oversight Committee.  A number of these documents confirm the allegations set forth in this Complaint.  Specifically, a summary of

Valeant's document production affirmed that: (i) "Mr. Pearson purchased Isuprel and Nitropress in order to dramatically increase their prices" and "Valeant identified goals for revenues first, and then set drug prices to reach those goals"; (ii) "Valeant used its patient assistance programs to justify raising prices and to generate increased revenues by driving patients into closed distribution systems"; (iii) Valeant "sought to exploit this temporary monopoly by increasing prices dramatically to extremely high levels very quickly"; and (iv) "Mr. Pearson utilized this strategy with many more drugs than Isuprel and Nitropress," as Valeant increased by more than 200% the prices of a number of prescription drugs in its portfolio from 2014 to 2015.

274.    Also at the hearing on February 4, 2016, Schiller acknowledged that Valeant acquired the Marathon drugs (Nitropress and Isuprel) for the purpose of raising prices, as the two drugs accounted for 4% of 2015 revenues despite the fact that they were only two of nearly two thousand drugs in Valeant's portfolio. Schiller also testified at the hearing that risks associated with Valeant's price-gouging strategy included "increased pressure for rebates from the payers, decreased sales volumes from hospitals, increased substitution of alternative products, and heightened competition from new generic or branded drugs."

275.    Pearson, Schiller, and Ackman also testified before the Senate Aging Committee, which conducted hearings concerning Valeant on April 27, 2016. Pearson submitted a written statement prior to the hearing that acknowledged "the company was too aggressive – and *I, as its leader, was too aggressive – in pursuing price increases* on certain drugs." Pearson and Schiller demonstrated throughout the hearing that they were actively involved in directing and implementing Valeant's drug pricing strategy. While Pearson sought to depict the price increases as industry standard, he acknowledged, in direct contravention of his prior statements, that "*[o]ur pricing has driven more growth than volume*. . . ."

276.    In response to Senator McCaskill's observation that price had been more responsible for growth than volume in all quarters since 2013 bar one, Pearson confirmed that Senator McCaskill was correct.  This confirmation directly contradicted Pearson's October 14, 2015, letter to Senator McCaskill in which he represented that "[t]here is a misperception in the media that Valeant's revenue growth for existing products has been driven primarily by price."

277.    Finally, the Congressional probes focused on the December 2014 Philidor Purchase Option and why the "option" cost $100 million but the potential "acquisition" would be free. Philidor's counsel provided the following written response: "Philidor concluded that Valeant's conduct was consistent with a concern about the economic impacts of any PBM response if Valeant had purchased Philidor."  This statement confirms that Philidor and Valeant were aware that the disclosure of Valeant's control over Philidor would result in PBMs refusing to reimburse prescriptions filled by Philidor (which would have negative repercussions on Valeant), which Valeant failed to disclose even as Philidor's existence was revealed.

278.    In October of 2015, U.S. Attorney's Office for the Southern District of New York launched an investigation of Valeant regarding its relationship with Philidor and its accounting treatment of sales by specialty pharmacies.  It subpoenaed the company, requesting documents and witness interviews with respect to the Company's patient assistance programs and contributions to patient assistance organizations that provide financial assistance to Medicare patients taking products sold by the Company, and the Company's pricing of its products.  On May 22, 2018, a jury in federal court in Manhattan convicted former senior Valeant executive Gary Tanner, and the former CEO at Philidor, Andrew Davenport, of criminal charges of fraud and conspiracy in connection with the massive scheme to fraudulently sell Valeant drugs.

F.    **Executive Departures**

279.    The departure of numerous executives and directors, including certain Management

103

Defendants, shortly before and after the revelations concerning the deceptive practices by Valeant and Philidor, further support an inference of scienter.

280.    Kornwasser departed Valeant in July 2015 – even more proximate to the Philidor revelations.  Following his departure, Kornwasser declined to speak to the press, and Valeant never made him available for an interview with the House Oversight Committee.

281.    Following the Philidor revelations, numerous senior-level members of management departed the Company.  For example, on or about March 2, 2016, news outlets reported that Jorn, the head of the U.S. Gastrointestinal and Dermatological divisions, was leaving Valeant, effective immediately.  As explained above, Philidor played a particularly vital role in boosting the sales of U.S. dermatology product lines.

282.    On March 21, 2016, Valeant announced in a press release that Pearson would leave the Company.  In that same press release, Valeant admitted that Schiller and Carro engaged in "improper conduct" while serving in Valeant's management.  Schiller was asked to resign from the Board and Carro was replaced as Corporate Controller.

283.    On May 20, 2016, Valeant revealed that Stoltz had resigned as Senior Vice President of Neurology, Dentistry, and Generics.

G.    **Pearson's Misrepresentations to Ackman**

284.    The fact that Pearson actively concealed Valeant's deceptive and illegal practices from Ackman, another large investor with whom Pearson had a continuing business relationship, provides further evidence of Pearson's scienter.

285.    In 2014, Ackman, who controlled Pershing Square, one of Valeant's then-largest shareholders, met with Pearson to create a partnership between Pershing Square and Valeant with the goal of acquiring Allergan.  Pursuant to their plan, Pershing Square bought a significant stake in Allergan in order to provide Valeant shareholder support.  Pershing Square would also publicly

vouch for the value of Valeant's stock (which Valeant was attempting to use to acquire Allergan).

286.     After Allergan's resistance and public campaign against Valeant's takeover attempt, in which Allergan challenged the sustainability of Valeant's business model, Pershing Square conducted further due diligence on Valeant.   Pershing Square subsequently invested another $4 billion in Valeant.  Ackman and Pearson had frequent contacts, including phone calls, emails, and dinners.  Ackman even introduced other investors to Pearson, offered to assist Pearson with earnings calls, and provided Pearson with advice after earnings calls.

287.     Despite Ackman's extensive relationship with Pearson, Pearson concealed the extent of Valeant's price gouging and deceptive and illegal conduct.  Ackman, revealing his lack of knowledge, frequently defended Valeant against public attacks, and even as late as October 6, 2015, publicly stated that a "[v]ery small part of Valeant's business is repricing drugs."

288.     Eventually, like the rest of the market, Ackman learned the truth.  Ackman testified before the Senate, under oath, that he was unaware of the "horrible" and "wrong" price increases that were later publicly disclosed with regard to Cupromine, Isuprel, Nitropress.  He further testified that "[c]learly [there] were things I did not understand about the business."

### H.     Executive Compensation

289.     Valeant had an unusual compensation structure that provided incredibly rich compensation packages if increasingly difficult performance goals were met.  The incentive to meet these goals, coupled with the threat of termination for failing to meet them, created a culture that valued fraudulent practices and results above ethics and truthfulness.

290.     Pearson's statement at a May 28, 2014, conference is illustrative of the increasingly difficult goals.  He stated that "[t]here's no tenure at Valeant.  It's up and out. . . . It's more like a professional services firm than a sort of traditional pharmaceutical company." He further explained that Valeant's compensation system was entirely dependent on an increasing stock price, stating:

So, our Company senior management and the Board – we – there's only one metric that really counts, and it's total return to shareholders.  That's how we're paid.  We have a unique pay model, that at least we – at least – if we don't at least achieve a 15% total return to shareholders each year, compounded annual growth rate, that basically the equity we receive in terms of our stock grabs is worth nothing.

291.    Valeant would ultimately admit that the aggressive compensation and performance-goal system employed at the Company contributed to the Defendants' wrongdoing. On March 21, 2016, the Company stated that it "determined that the tone at the top of the organization and the performance-based environment at the Company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the Company's improper revenue recognition."

292.    Though missing targets was punished with forfeiture of bonuses or worse, meeting the aggressive financial targets resulted in multi-million-dollar awards for executives. For example, in 2014 Pearson received an $8 million incentive bonus, which was four times his $2 million base compensation.  Similarly, Schiller received a $2.4 million incentive bonus, which was nearly two and half times his base compensation.

293.    These incentives paled in comparison to the amount Pearson would receive if he was able to maintain (or increase) Valeant's stock price until 2017, when he would be permitted to sell his Valeant shares.  The value of those shares as of March 31, 2014, was approximately $1.3 billion.  If Pearson could hold steady or raise the stock price through 2017, he could cash out his shares for well over $1 billion.  Bill Ackman revealed in April 2014 that much of Pearson's compensation was tied to incredibly aggressive stock price targets requiring compounded returns over three years of between 15% and 60%.

294.    This unusual package incentivized Pearson to use any means necessary, including illegal and deceptive means, to continue to increase the stock price through 2017 even at the expense of the Company's long-term health and financial stability.

295.    Pearson also took out a $100 million margin loan from Goldman Sachs pledging his shares (which he could not sell) as collateral – which was against Company guidelines and therefore required board approval.  This created a further incentive to artificially inflate the price of the Valeant shares because if the value of the shares fell, Goldman Sachs could make a margin call and force the sale of the shares to repay itself.  This, in fact, happened in November 2015.

296.    During the Relevant Period, Schiller also had millions of dollars in incentive compensation tied to meeting challenging share price increases.

297.    Ultimately, on March 21, 2016, Valeant admitted that its overly aggressive compensation targets had contributed to the wrongdoing at Valeant, stating:  "the Company has determined that the tone at the top of the organization and the performance-based environment at the Company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the Company's improper revenue recognition."

298.    Valeant's admitted issues with the "tone at the top" further supports an inference of scienter, since accounting and internal control guidance expressly recognize the importance of "top management" setting an appropriate tone.  *See* SEC Staff Accounting Bulletin No. 99 at 16. As CEO during the Relevant Period, Pearson was ultimately responsible for Valeant's internal controls and setting an appropriate "tone at the top" which prioritized ethics and compliance with accounting practices over personal financial gain.  He failed to do so.

### I.    The Necessity of Inflating Valeant's Stock Price to Sustain Valeant's Acquisition-Centric Business Model

299.    The Management Defendants also possessed motive to conceal their fraudulent business practices meant to inflate Valeant's stock price so as to sustain the viability of Valeant's acquisition strategy.  Without spending on R&D, Valeant was entirely dependent upon acquiring

drugs or entire portfolios from other pharmaceutical companies.   The price of Valeant's stock played a significant role in either facilitating or impeding these acquisitions.

300.    In 2014, for instance, Valeant issued a cash and shares tender offer for shares of Allergan's stock, meaning that the value of Valeant's stock determined the value of Valeant's offer.  Indeed, Allergan's shareholders indicated to Ackman that they would support Valeant's bid if Valeant could "deliver $180 a share in Valeant in the value of the bid," meaning that the higher Valeant's stock price rose, the less cash Valeant would be required to include its offer.

301.    Similarly, Defendants utilized Valeant's inflated stock price to raise significant sums of capital in debt and stock offerings, which they used to fund Valeant's acquisition strategy. For example, during the Relevant Period, Valeant conducted a series of massive high- yield debt offerings, producing almost $15 billion in cash for the Company from the investing public, which Valeant then used to acquire companies such as Salix and Bausch & Lomb.  As another example, the March 16, 2015, stock offering in which Plaintiffs purchased Valeant common stock provided an additional $1.5 billion of capital for Valeant's acquisition of Salix.

## VII.   LOSS CAUSATION

302.    As described above, Defendants' wrongful conduct proximately and directly caused Plaintiffs' economic loss.  Defendants' statements and material omissions either caused or were a substantial contributing factor in causing Valeant's stock to trade at artificially inflated priced during the Relevant Period.  Due to Defendants' misstatements and material omissions, Valeant's stock reached $262.5 per share on August 5, 2015.

303.    When the false and misleading nature of Defendants' statements became apparent to the market, commencing in the third quarter of 2015 and continuing through the third quarter of 2016, Valeant's stock price plummeted, closing at as low as $24 per share on June 7, 2016. Tens of billions of dollars of shareholder market capitalization was destroyed when Defendants' false

and misleading statements came to light, causing substantial damage to Plaintiffs and other investors.

304.     The corrective disclosures, revealing the artificially inflated price of Valeant shares, were disseminated gradually through a number of partial disclosures, discussed above in ¶¶ 181-242, revealing the truth and gradually undermining the market's willingness to accept the Defendants' misrepresentations and material omissions.  These disclosures caused economic injury to Plaintiffs.  No single disclosure was sufficient to fully negate the artificial inflation present in Valeant's common stock, because each single disclosure only partially revealed the concealed risks in Valeant's business.  Moreover, Defendants' repeated misstatements and omissions after or even in direct response to a corrective revelation further mitigated the corrective impact of any particular disclosure.  The continued misrepresentations not only mitigated declines in the price of Valeant's publicly traded securities so as to artificially preserve some degree of inflation, but also directly induced Plaintiffs to retain their existing Valeant shares and purchase additional Valeant common stock even after certain corrective information had entered the market. The release of subsequent additional corrective information caused further price declines that caused additional injury to Plaintiffs.

## VIII.  PLAINTIFFS' RELIANCE

305.     During the Relevant Period, Plaintiffs relied upon the materially false and misleading statements alleged herein when purchasing Valeant common stock.

306.     In this case, there is a presumption of reliance established by fraud-on-the-market doctrine because: (i) the Defendants made public misrepresentations or failed to disclose material facts during the Relevant Period; (ii) the misrepresentations and omissions were material; (iii) the Company's common stock traded in efficient markets; (iv) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's

common stock; and (v) Plaintiffs purchased Valeant common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed without knowledge of the misrepresented or omitted facts.

307.    At all relevant times, the markets for Valeant's common stock were efficient for the following reasons, among others: (i) As a regulated issuer, Valeant filed periodic public reports with the SEC on a consolidated basis; (ii) Valeant regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide- ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; (iii) Valeant was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force(s) and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and, (iv) Valeant's common stock was listed and traded actively on the NYSE, a highly automated and efficient market.

308.    As a result of the foregoing, the markets for Valeant common stock promptly digested current information regarding the Company and its subsidiaries from all publicly available sources and reflected such information in the prices of the Valeant common stock. Under these circumstances, Plaintiffs were injured by their purchases of Valeant common stock during the Relevant Period at artificially inflated prices, and the presumption of reliance applies.

309.    Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

310.    Furthermore, Plaintiffs actually relied on Defendants' misrepresentations and

material omissions when deciding whether to purchase Valeant stock.  The investments of Plaintiffs were managed by their advisor, Maverick Capital, which employed an analytical, research-based investment process.  Under that process, portfolio managers, with the assistance of analysts, made the decisions whether to purchase, sell, or hold Valeant securities for Plaintiffs.

311.   Throughout the Relevant Period, Maverick Capital investment personnel performed rigorous research, including reading and relying on publicly available information concerning Valeant.  Among other things, in deciding whether to purchase, sell, or hold Valeant stock, Maverick Capital investment personnel read and relied on (1) Valeant's 10-Qs and 10-Ks, in particular statements regarding the Company's cash flows; (2) Valeant press releases and earnings conference calls, including slide decks used by Valeant executives in connection with those presentations; (3) analyst reports concerning Valeant; (4) group meetings with Valeant senior executives at industry conferences; and (5) one-on-one meetings and calls with Valeant senior executives, including Michael Pearson and Howard Schiller.  Additionally, Maverick Capital investment personnel met with Valeant executives during Non-Deal Roadshows.

312.   Defendants' false or misleading statements alleged in this Complaint were a substantial factor in Maverick Capital's investment decisions with respect to Valeant stock.  The investment personnel responsible for those decisions did not know, and in the exercise of reasonable diligence could not have known, of Defendants' misconduct alleged in this Complaint when deciding that Plaintiffs should purchase, sell, or hold Valeant securities during the Relevant Period.

IX.   **NO SAFE HARBOR**

313.   The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint.  The statements complained of herein were historical statements or statements of

current facts and conditions at the time the statements were made.  Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

314.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Valeant who knew that the statement was materially false or misleading when made.

## X.    COUNTS

### COUNT I
### VIOLATIONS OF SECTION 10(B) OF THE
### SECURITIES EXCHANGE ACT OF 1934 AND RULE 10(B)
### (Against All Defendants)

315.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

316.    This claim is brought by Plaintiffs against Defendants for violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

317.    During the Relevant Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they misrepresented or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

318.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material

facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs related to the purchase and/or acquisition of Valeant common stock.

319.   In addition to the duties of full disclosure imposed on the Defendants attendant to their affirmative false and misleading statements to the public, Defendants had a duty under SEC Regulations S-X (17 C.F.R. §210.01, et seq.) and S-K (17 C.F.R. §229.10, et seq.) to promptly disseminate truthful information with respect to Valeant's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market prices of the Company's securities would be based on truthful, complete, and accurate information.

320.   As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases and acquisitions of Valeant common stock during the Relevant Period.  In reliance on the integrity of the market and in actual reliance on Defendants' misrepresentations and omissions, Plaintiffs paid artificially inflated prices for Valeant common stock and experienced losses when the artificial inflation was removed from the stock as a result of the revelations and price declines detailed herein. Plaintiffs would not have purchased or acquired Valeant common stock at the prices they paid, or at all, if they had been aware that those prices had been inflated by Defendants' misleading statements and omissions.

321.   By virtue of the conduct alleged herein, Defendants have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs.

322.   Taking into account, *inter alia*, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Valeant Pharmaceuticals*

*International, Inc. Securities Litigation*, No. 15-cv-7658 (D.N.J.), Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and Plaintiffs have also bought this action within five years of the violations alleged herein.  Consequently, this action is timely.

**COUNT II**
**VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT OF 1934**
**(Against Defendants Valeant, Pearson, Schiller, and Rosiello)**

323.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

324.    This claim is brought by all Plaintiffs against Defendants Valeant, Pearson, Schiller, and Rosiello for violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78(a).

325.    During their tenures as officers and/or directors of Valeant, Pearson, Schiller, and Rosiello were controlling persons of Valeant within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Valeant, these Defendants had the power and authority to cause Valeant to engage in the conduct complained of herein.  These Defendants were able to, and did, control, directly and indirectly, the decision making of Valeant, including the content and dissemination of Valeant's public statements and filings described herein, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.  Valeant exercised control over and directed the actions of its senior managers, directors and agents, including the individual Defendants.  Valeant controlled Pearson, Schiller, Rosiello and all of its employees and subsidiaries.

326.    In their capacities as senior officers and/or directors of Valeant, and as more fully described herein, Pearson, Schiller, and Rosiello participated in the misstatements and omissions set forth above.  These Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had access to non-public information regarding Valeant's

114

deceptive and risky business practices.  Valeant, Pearson, Schiller and Rosiello had the ability to influence and direct and did so influence and direct the activities of each of the Defendants in their violations of Section 10(b) of the Exchange Act and Rule 10b-5.

327.   As a result, Valeant, Pearson, Schiller, and Rosiello, individually and as a group, were control persons within the meaning of Section 20(a) of the Exchange Act.

328.   As set forth above, Valeant violated Section 10(b) of the Exchange Act.  By virtue of their positions as controlling persons, and as a result of their aforesaid conduct and culpable participation, Pearson, Schiller, and Rosiello are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Valeant is liable to Plaintiffs.  Valeant exercised control over the individual Defendants and all of its employees and subsidiaries and, as a result of its aforesaid conduct and culpable participation is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the individual Defendants are liable to Plaintiffs.

329.   By reason of the foregoing, Valeant, Pearson, Schiller, and Rosiello violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78(a), and are liable to Plaintiffs.

330.   Taking into account, *inter alia*, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Valeant Pharmaceuticals International, Inc. Securities Litigation*, No. 15-cv-7658 (D.N.J.), Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.      Awarding Plaintiffs compensatory damages in an amount to be proven at trial for all injuries sustained as a result of Defendants' wrongdoing, including pre-judgment and post-judgment interest, and punitive damages as allowed by law;

B.      Awarding Plaintiffs extraordinary, injunctive and/or equitable relief, including in addition to any other relief that is just and proper under the circumstances;

C.      Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other relief as this Court may deem just and proper.

## XII.      JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury in this action on all issues so triable.

Dated: February 28, 2020                                Respectfully submitted,

**KIRBY McINERNEY LLP**

By: _Karen M. Lerner_

Mark A. Strauss (*pro hac vice* forthcoming)
Ira M. Press (*pro hac vice* forthcoming)
Karen M. Lerner
825 Third Avenue, 16th Floor
New York, NY 10022
Tel: (212) 371-6600
Fax: (212) 751-2540
mstrauss@kmllp.com
ipress@kmllp.com
klerner@kmllp.com

*Counsel for Plaintiffs*

**CERTIFICATE PURSUANT TO L. CIV. R. 11.2**

I certify that, to the best of my knowledge, the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

I certify under penalty of perjury that the forgoing is true and correct. Executed on this 28th day of February 2020.

**KIRBY McINERNEY LLP**

By: _Karen M. Lerner_

Karen M. Lerner